**Certiorari Granted, February 8, 2010, No. 32,131**
**Certiorari Granted, February 8, 2010, No. 32,099**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-021**

**Filing Date: November 24, 2009**

**Docket No. 27,761**

**MICHAEL and TIA WACHOCKI, individually**
**and as Personal Representatives of the Estate of**
**JASON WACHOCKI, deceased, and BILL WACHOCKI,**

      **Plaintiffs-Appellees/Cross-Appellants,**

**v.**

**BERNALILLO COUNTY SHERIFF'S DEPARTMENT,**

      **Defendant-Appellant/Cross-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Linda M. Vanzi, District Judge**

McGinn, Carpenter, Montoya & Love, P.A.
Randi McGinn
A. Elicia Montoya
Albuquerque, NM

for Plaintiffs-Appellees/Cross-Appellants

Kennedy, Moulton & Wells, P.C.
Deborah D. Wells
Albuquerque, NM

for Defendant-Appellant/Cross-Appellee

Slease & Martinez, P.A.
William D. Slease
Jonlyn M. Martinez
Albuquerque, NM

for Amicus Curiae NM Association of Counties

## OPINION

**BUSTAMANTE, Judge.**

{1}     The Bernalillo County Sheriff's Department (BCSD) appeals the judgment of the district court holding it thirty percent liable for the wrongful death of Jason Wachocki. BCSD argues (1) that several of the district court's factual findings were not supported by substantial evidence; (2) that the district court erred in finding that Jason Wachocki had no comparative fault in causing his death; (3) that the district court erred in calculating the lost value of Jason's life and household services; and (4) that the court improperly determined that this claim fell within the waiver of sovereign immunity for law enforcement officers under NMSA 1978, Section 41-4-12 (1977). We do not address the three evidentiary arguments because BCSD failed to conform to the rules of appellate procedure with regard to briefing such issues. We affirm the district court's decision that the Tort Claims Act does not provide immunity in this case.

{2}     Jason's parents and adult brother cross appeal. Michael and Tia Wachocki argue on behalf of their son's estate that the $400,000 cap under the Tort Claims Act is unconstitutional and that a judgment for full damages should have been entered against BCSD. Bill Wachocki argues that the court improperly denied his claim for loss of consortium with his deceased brother. We conclude that the cap on damages remains constitutional because it continues to bear a rational relation to a legitimate governmental purpose and that the right to recover for loss of consortium does not extend to the facts of this case.

## BACKGROUND

{3}     This case arises from the death of twenty-two-year-old Jason Wachocki (Jason). Jason was killed when his vehicle was struck by a speeding van driven by Willie Hiley (Willie), a corrections officer at the Metropolitan Detention Center (jail). After a bench trial, the district court found Willie seventy percent at fault for Jason's death and BCSD thirty percent at fault. The court concluded that BCSD's liability resulted from its negligence in failing to enforce traffic laws against jail corrections officers on Shelly Road.

{4}     The fatal collision occurred at the intersection of Shelly Road and Speedway Boulevard west of Albuquerque. Shelly Road is a two-lane road running north and south, providing access to the jail, Sandia Motor Speedway (the race track), and the Albuquerque Solid Waste Management Department (SWMD). Speedway Boulevard makes a T-intersection with Shelly Road, and leads to the race track to the west. BCSD has the responsibility for patrolling these roadways.

{5}     Jason worked weekends at the race track on the fire and safety crew. As Jason left his shift on the night of August 21, 2004, he traveled east along Speedway Boulevard, coming to a complete stop at the three-way intersection with Shelly Road at approximately 10:58 p.m. At the same time, Willie was driving south along Shelly Road on his way to work the graveyard shift at the jail. As

Willie approached the intersection of Speedway Boulevard, he turned off his vehicle's headlights in an apparent attempt to determine whether there were any other vehicles in the area based on signs of illumination from their headlights. As Jason proceeded through the intersection, Willie's vehicle came out of the darkness with its headlights off, making it impossible for Jason to see it approaching. Willie ran the stop sign driving in excess of 75 miles per hour, or almost twice the posted speed limit, striking Jason's vehicle and killing him instantly.

**{6}** As early as 2000, before the jail was in operation, BCSD was informed by a SWMD supervisor about a "very serious traffic situation" on Shelly Road, involving motorists speeding and running the stop sign. BCSD responded by twice running "traffic specials" in the area and by training SWMD safety officers in the use of radar guns so that SWMD could monitor and issue citations to its own employees. In a series of speed audits, SWMD safety officers clocked vehicles—including non-SWMD employees—going 51-111 mph in a 45 mph zone, documenting thirty-nine violations in one day alone.

**{7}** The jail opened in 2003 and traffic increased significantly on Shelly Road. The new jail had 75-100 employees working each of its three shifts. These employees, along with law enforcement and members of the public, all began using Shelly Road to get to and from the jail.

**{8}** In the fourteen months between the opening of the jail and Jason's death, BCSD received numerous complaints about corrections officers and others violating traffic laws on Shelly Road. It also received requests to enforce the traffic laws on the roadways leading to the jail. Harry Tipton, the jail's director, had witnessed law enforcement officers, corrections officers, and members of the public speeding, passing illegally, and running through stop signs in the area, and asked BCSD to step up patrols. Dawn Freeze, the general manager of the race track, saw traffic violations on an almost daily basis, including speeding, illegal passing, and running stop signs. She made twenty phone calls reporting traffic violations by law enforcement officers, corrections officers, and others, and specifically requested traffic enforcement. Chuck Tipton, Jason's boss at the race track, made two phone calls reporting traffic violations and requesting enforcement. A similar phone call was made by Mike Archuleta, security superintendent for SWMD.

**{9}** The district court found that BCSD failed to respond to any of these requests to enforce traffic laws on the roads leading to the jail and that it did not enforce traffic laws against law enforcement officers and most corrections officers. After the opening of the jail and before Jason's death, SWMD continued to monitor traffic in the area and documented 192 vehicles speeding, illegally passing, and running stop signs over five separate days. Most of the vehicles violating traffic laws were those of law enforcement officers or corrections officers. The district court found that during the same time that these violations occurred, BCSD wrote a total of three speeding citations and one warning for running the stop sign at the intersection where Jason was killed. Even after Jason's death, video surveillance of the intersection revealed that BCSD's own officers continued to run the stop sign at Shelly Road. Jason's younger brother Bill also testified that he was actually a passenger in a jail transport van that sped through the stop sign on its way to the jail after Jason's death.

**{10}** The district court also found that BCSD knew that its failure to patrol traffic on Shelly Road could lead to a serious accident. At trial, Sheriff Darren White candidly acknowledged that if traffic

laws were not enforced in a certain area, or against certain persons, vehicles would drive very fast causing more accidents and more severe accidents. Sheriff White also testified that issuing citations would deter violations of traffic laws not only by the person receiving the citation, but also by those who see the police taking enforcement action.

**{11}** Based on the foregoing, the district court found that Willie knew

that although law enforcement and corrections officers were speeding, illegally passing and running the stop signs, the BCSD was not enforcing the traffic laws against them on the roadways to and from the [jail;]

. . . that because BCSD did not stop or issue any citations to law enforcement or corrections officers, he would not be stopped or punished for violating the traffic laws on those roadways.

**{12}** The court concluded that:

The [BCSD], through its deputies and employees, was negligent in violating the traffic laws on Shelly Road, the frontage road and at the 3-way intersection on the road to the [jail].

The [BCSD], through its deputies and employees, was negligent in not enforcing the law and allowing other deputies, law enforcement officers and most corrections officers to violate the traffic laws on Shelly Road, the frontage road and at the 3-way intersection on the road to the [jail].

The BCSD, through its deputies and employees, was negligent in deciding not to respond to citizen complaints and concerns about speeding, illegal passing and running the stop sign on Shelly Road and at the 3-way intersection.

The negligence of the BCSD, through its deputies and employees, was a contributing cause of the collision on August 21, 2004[,] and the wrongful death of Jason Wachocki.

**{13}** The district court set the total compensatory damages for Jason's death at $3,707,563.82. BCSD's comparative fault portion amounted to $1,112,269.15, but the judgment was capped at $400,000 pursuant to NMSA 1978, Section 41-4-19(A)(3) (1991) (amended 2007), which sets forth maximum governmental liability under the Tort Claims Act, NMSA 1978, §§ 41-4-1 to -27 (1976, as amended through 2009). The Wachockis argue that this cap has become unconstitutional because it has failed to account for inflation and cost-of-living increases since it was imposed. They argue that it no longer serves any rational purpose because economic changes have rendered it useless as a deterrent to governmental negligence and because it violates a fundamental right to hold one's government fully accountable for its negligent acts.

**{14}** Jason's brother, Bill Wachocki, cross appeals the denial of his claim for loss of consortium. Bill was twenty-two years old at the time his brother was killed. He and Jason had been roommates

for approximately eight months immediately preceding Jason's death. During that time the two split bills, shared household chores, socialized together, and relied on each other for friendship.

## DISCUSSION

### BCSD's Evidentiary Arguments Cannot be Addressed

**{15}** We do not address BCSD's challenge of the district court's findings of fact substantively because its brief does not conform to the New Mexico Rules of Appellate Procedure. Its brief renders it virtually impossible for us to review its assertions because it fails to cite the record and fails to present the evidence as a whole. The only way to properly support a challenge to the sufficiency of the evidence is to include in the argument section of the brief in chief "citations to authorities, record proper, transcript of proceedings or exhibits relied upon." Rule 12-213(A)(4) NMRA. Where a party fails to cite any portion of the record to support its factual allegations, the Court need not consider its argument on appeal. *Santa Fe Exploration Co. v. Oil Conservation Comm'n*, 114 N.M. 103, 108, 835 P.2d 819, 824 (1992).

**{16}** The argument section of BCSD's brief includes no citations as required by the Rule. Its multiple assertions are virtually impossible to confirm given the large record: a 1300-page record proper, multiple volumes of trial testimony transcripts, and many exhibits. "This [C]ourt will not search the record to find evidence to support an appellant's claims." *In re Estate of Heeter*, 113 N.M. 691, 694, 831 P.2d 990, 993 (Ct. App. 1992).

**{17}** Furthermore, BCSD fails to demonstrate how the district court's findings were unsupported by substantial evidence. "A contention that a . . . finding of fact is not supported by substantial evidence shall be deemed waived unless the argument identifies with particularity the fact or facts that are not supported by substantial evidence." Rule 12-213(A)(4). Where the appellant fails to "include the substance of all the evidence bearing upon a proposition," the Court of Appeals will not consider a challenge to the sufficiency of the evidence. *Martinez v. Sw. Landfills, Inc.*, 115 N.M. 181, 186, 848 P.2d 1108, 1113 (Ct. App. 1993). Here, BCSD discussed only those facts which it argues tend to show that some of the district court's findings were contradicted. BCSD wholly fails to address the substance of all the evidence bearing on the findings. In doing so, BCSD of necessity did not demonstrate how the evidence supporting the district court's findings fails to amount to substantial evidence. Accordingly, BCSD's challenges to the district court's findings of fact are deemed waived, and we will not consider its challenge to the sufficiency of the evidence.

### The Wachockis' Claim for Wrongful Death Falls Within the Tort Claims Act Waiver of Immunity for Law Enforcement Officers

**{18}** "Generally, the Tort Claims Act provides governmental entities and public employees acting in their official capacities with immunity from tort suits unless the Act sets out a specific waiver of that immunity." *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 121 N.M. 646, 649, 916 P.2d 1313, 1316 (1996). "Section 41-4-12 of the Act sets out the applicable waiver of immunity for the acts or omissions of law enforcement officers," listing several specific torts for which liability is waived. *Weinstein*, 121 N.M. at 649, 916 P.2d at 1316. Section 41-4-12 waives immunity from liability for "wrongful death . . . resulting from . . . deprivation of any rights . . .

5

secured by the . . . laws of . . . New Mexico when caused by law enforcement officers while acting within the scope of their duties." *Weinstein*, 121 N.M. at 649, 916 P.2d at 1316 (internal quotation marks omitted). This waiver covers intentional torts committed by law enforcement officers but can also extend to acts committed by third parties when caused by law enforcement negligence. *Id.* at 652, 916 P.2d 1319. We review de novo whether this wrongful death claim falls within the waiver of immunity under Section 41-4-12. *See In re Estate of Armijo,* 2000-NMCA-008, ¶ 5, 128 N.M. 565, 995 P.2d 487 (filed 1999) (holding that construction of a statute is a matter of law), *aff'd in part, rev'd in part and remanded by* 2001-NMSC-027, 130 N.M. 714, 31 P.3d 372.

**{19}** BCSD argues that the facts of this case are not within the purview of the waiver found in Section 41-4-12. It argues that, to fall within the waiver, there must have been a specific incident to which law enforcement failed to respond. The New Mexico Association of Counties (NMAC) provides amicus briefing on this issue and makes a similar argument. It argues that the facts of this case fall outside the waiver because each prior case finding a Section 41-4-12 waiver has dealt with "a specific criminal act in progress or a specific criminal actor who had been called to the attention of law enforcement and to which law enforcement wholly failed to respond or allowed to proceed without taking any enforcement or protective actions for the benefit of foreseeable victims." Essentially, their argument is that BCSD's statutory duties did not extend to Jason because it was either not foreseeable that any injury could result from its inaction, or because Jason was not a foreseeable victim of such inaction.

**{20}** Our Supreme Court rejected similar arguments in *Torres v. State*, 119 N.M. 609, 894 P.2d 386 (1995). In *Torres*, a murder suspect eluded a manhunt in New Mexico, fled to California, and killed two people. The estates of the California victims brought suit, asserting that the New Mexico law enforcement entities involved were negligent in the way they conducted their investigation. The Albuquerque Police Department and New Mexico Department of Public Safety argued that as a matter of law the out-of-state victims were not foreseeable because they were too remote from anything that occurred in New Mexico. *Id.* at 612-13, 894 P.2d at 389-90. Specifically, they argued that in the context of alleged negligent investigation by law enforcement, a victim is not foreseeable unless he or she is in imminent danger. *Id.* at 613, 894 P.2d at 390. The Supreme Court rejected this argument, noting that the "[L]egislature has enunciated no policy that gives rise to arbitrary time and place restrictions on the duty of law enforcement officers." *Id.* at 614, 894 P.2d at 391.

**{21}** In *Torres,* the Supreme Court also refused to limit negligent investigation actions to circumstances where the police knew the identity and condition of the criminal actor. *Id.* The Court noted that "knowledge of the identity . . . of the criminal . . . is not determinative in defining duty." *Id.* Instead, the Court stated the question of forseeability, as it relates to Section 41-1-12, as whether "there is a possible risk . . . to some victim and the officer knows of that risk." *Torres*, 119 N.M. at 614, 894 P.2d at 391.

**{22}** In describing the duty to investigate under NMSA 1978, Section 29-1-1 (1979), the Court held that "[a]ll persons who are foreseeably at risk within the general population are within the class of persons to be protected." *Torres*, 119 N.M. at 615, 894 P.2d at 392. In short, the Supreme Court made clear that the duty to investigate under Section 29-1-1 is subject to a "traditional tort concept of forseeability." *Torres*, 119 N.M. at 615, 894 P.2d at 392. The statute itself does not alter the normal tort analysis of forseeability. The duty may run to known individuals or a class of

6

individuals. *See Schear v. Bd of County Comm'rs*, 101 N.M. 671, 675, 687 P.2d 728, 732 (1984) (involving a known potential victim); *California First Bank v. State*, 111 N.M. 64, 66, 801 P.2d 646, 648 (1990) (involving a group of potential, but unidentified, individuals—persons driving on a certain route being used by an intoxicated driver).

{23} Contrary to BCSD and NMAC's arguments, the Section 41-4-12 waiver of immunity requires only that the "defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law." *Weinstein*, 121 N.M. at 649, 916 P.2d at 1316. There is no dispute that BCSD was a law enforcement entity acting within the scope of its authority. Therefore, the salient issue is whether Jason's wrongful death resulted from one of the enumerated torts or from the deprivation of some right.

{24} Here, the Wachockis argue that Jason's wrongful death resulted from BCSD's deprivation of rights secured to him by NMSA 1978, Section 4-37-4 (1975), and Section 29-1-1. Section 4-37-4(A)(1) states in relevant part that "[i]t is the duty of every county sheriff, deputy sheriff, constable and other county law enforcement officer to . . . enforce the provisions of all county ordinances." Section 29-1-1 states in relevant part that "[i]t is hereby declared to be the duty of every sheriff, deputy sheriff, constable and every other peace officer to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware." Both sections secure private rights that may be enforced under the Tort Claims Act because the duties they establish are designed to protect individual citizens from harm. *Weinstein*, 121 N.M. at 654-55, 916 P.2d at 1321-22. Claims for injuries proximately caused by an officer's negligent breach of one or more of these duties are within the purview of Section 41-4-12. *Torres*, 119 N.M. at 612, 894 P.2d at 389.

{25} A deprivation of one of these rights may occur where law enforcement fails to investigate or take enforcement action against certain persons committing criminal acts. For example, in *California First Bank*, 111 N.M. at 68, 801 P.2d at 648, the McKinley County Sheriff's Department allegedly followed a policy of non-enforcement against persons who may have been driving under the influence after having patronized "Indian Bars." There, sheriff's deputies saw Harrison Shorty come out of a bar, fire off several shots with a firearm, and then re-enter the bar. *Id.* Despite witnessing this sequence of events, the deputies failed to intervene or apprehend Shorty. *Id.* Shorty later drove away from the bar in an intoxicated state and was involved in a collision that killed three people. *Id.* The sheriff's department was sued for failing to investigate the driver as required by Section 29-1-1. *California First Bank*, 111 N.M. at 73, 801 P.2d at 655. Our Supreme Court concluded that the claims against the sheriff's department fell within the purview of the waiver. *Id.*

{26} The similarity between the facts of *California First Bank* and this case are evident. Shorty was a member of a specific group against whom certain traffic laws were not enforced as a matter of policy. Willie was a jail corrections officer, one of the groups against whom—as determined by the district court—BCSD failed to enforce traffic laws on Shelly Road. Both cases involve decisions by law enforcement to ignore a known risk to motorists created by the improper driving of others. The situation here is more aggravated given that the offending parties were in large part members of law enforcement themselves.

7

{27} The district court's findings support its conclusion that BCSD breached its duties under Sections 4-37-4 and 29-1-1. Specifically, the district court found that BCSD received numerous complaints from the public and jail officials about the dangerous traffic situation on Shelly Road involving its own officers, the jail corrections officers, and others. Despite this knowledge, during the period between the opening of the jail and Jason's death, BCSD did not enforce traffic laws as required by Section 4-37-4 against its own officers, corrections officers, and others using Shelly Road. BCSD failed to investigate violations of traffic laws even though it was made aware of the problem by numerous complaints from credible sources. Disturbingly, this pattern continued even after Jason's death.

{28} There remains the issue of whether this breach contributed to cause Jason's death. *See* § 41-4-12 (waiving immunity for wrongful death resulting from deprivation of rights "when caused by law enforcement officers while acting within the scope of their duties"). The established law of negligence guides our analysis. *Weinstein*, 121 N.M. at 652, 916 P.2d at 1319. In negligence, "[a] proximate cause requires only a result that proceeds in a natural and continuous sequence from the act or omission in question." *Cross v. City of Clovis*, 107 N.M. 251, 255, 755 P.2d 589, 593 (1988). Here, Sheriff White testified that the failure to enforce traffic laws would result in more accidents and more serious accidents. He also testified that by fulfilling its enforcement obligations, BCSD could deter traffic violations. It would be anomalous to discount Sheriff White's testimony on these matters. Thus, the district court could reasonably conclude, based on BCSD's articulation of the known ramifications of non-enforcement, that the collision and resulting fatality were natural consequences of the risk created by BCSD's failure to act. In short, BCSD's failure to act made Jason's death tragically predictable.

{29} Finally, BCSD and NMAC rely on *Bober v. New Mexico State Fair*, 111 N.M. 644, 808 P.2d 614 (1991), to argue that immunity is not waived under the facts of this case. The plaintiff in *Bober* was injured when the vehicle in which she was a passenger was struck by another vehicle exiting the State Fair grounds amid heavy traffic after a rock concert. Plaintiff sued the New Mexico State Police, among others, alleging that the "State Police had a duty to provide adequate traffic supervision and control on the Fairground while patrons were leaving the concert." *Id.* at 653, 808 P.2d at 623. The Supreme Court upheld dismissal of the case against the State Police on two related grounds. First, the Court held that the bare assertion of negligence, with no supporting facts indicating how any duty to act was invoked or arose in the particular fact pattern, was insufficient. *Id.* at 653-54, 808 P.2d at 623-24. Second, the Court noted that Section 41-4-12 requires more than simple negligence in the performance of a law enforcement officer's duties. *Bober*, 111 N.M. at 653-54, 808 P.2d at 623-24. As illustrations of the type of facts or circumstances which amount to more than simple negligence, the Court cited *Cross*, *Schear*, and *Methola v. County of Eddy*, 95 N.M. 329, 622 P.2d 234 (1980) each of which involved an intentional tort committed by a third party as a result of the negligence of law enforcement officers. By contrast to *Bober*, *Cross*, *Schear*, and *Methola*, the Wachockis have proved specific facts invoking BCSD's duty to investigate, and they have introduced evidence from which the district court could reasonably conclude that BCSD's negligent non-enforcement of traffic laws caused a third party, Willie, to commit an intentional tort. Thus, everything the Court pointed out as missing in the claim against the State Police in *Bober* is present here. As such, *Bober* is simply not applicable.

**Public Policy Does Not Foreclose Liability**

8

**{30}**     In its amicus curiae brief, NMAC asserts that our affirmance of the district court's decision will, in effect, penalize BCSD for its resource-allocation decisions. It argues that the appropriate allocation of limited funds requires BCSD to exercise judgment about where to focus its efforts and that the courts are in no position to second-guess such internal decisions. While we are mindful that BCSD and other law enforcement agencies must operate in the face of resource constraints, we cannot agree that this justifies immunity under these facts. A similar argument was made in *Torres*. The Supreme Court's response then is equally apropos here:

> The Court of Appeals held that as a matter of policy the duty to investigate and the duty to exercise ordinary care should not be extended to the victims in this case because it would be 'unrealistic in light of rising criminal activity and limited public resources.' Although 'rising criminal activity' and 'limited public resources' may be factors for the jury to consider in determining whether APD or DPS breached its duties, . . . and while these factors may bear upon the discharge of duty, they do not bear upon the existence of the statutory duty of law enforcement officers to investigate crimes.

*Torres*, 119 N.M. at 612, 894 P.2d at 389 (internal quotation marks, citation and footnote omitted). Our holding does not constrain BCSD's discretion in determining how to best allocate its resources beyond the constraints, if any, already imposed by the Legislature under Sections 4-37-4 and 29-1-1.

**{31}**     Further, the aggravated facts here argue against NMAC's position. BCSD had ample notice of repeated dangerous traffic violations by its own employees, officers, jail employees, and city employees. Its response was minimal at best, even though the sheriff himself recognized the potential consequences of non-enforcement. If this set of facts were to be deemed off-limits to judicial review, the policy choices embodied in Sections 4-37-4 and 29-1-1, as well as in the Tort Claims Act, would be largely negated.

**Constitutionality of the Tort Claims Act Cap on Damages**

**{32}**     On cross appeal, the Wachockis argue that BCSD's liability should not have been capped at $400,000 because the Tort Claims Act's cap on damages is unconstitutional under both the State and Federal Constitutions. The Wachockis assert that the cap is unconstitutional based on four grounds: (1) that the cap violates state and federal guarantees of equal protection, (2) it violates the guarantee of substantive due process, (3) it encroaches on the separation of powers clause, and (4) it encroaches on the right to a jury trial.

**{33}**     We review the Wachockis' constitutional challenges de novo. *State v. Druktenis*, 2004-NMCA-032, ¶ 14, 135 N.M. 223, 86 P.3d 1050. "[T]here exists a presumption of constitutionality, and the party attacking the constitutionality of the statute has the burden of proving the statute is unconstitutional beyond all reasonable doubt." *ACLU of N.M. v. City of Albuquerque*, 2006-NMCA-078, ¶ 10, 139 N.M. 761, 137 P.3d 1215 (internal quotation marks and citation omitted).

**{34}**     Although the Wachockis raise equal protection and due process claims under both the State and Federal Constitutions, they have not made the required showing for divergence from federal precedent. *See State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1 (stating that a

9

state court may rely on the state constitution, diverging from federal precedent, only if it is shown that there is "a flawed federal analysis, structural differences between [the] state and federal government, or distinctive state characteristics" (citation omitted)). "We therefore limit our due process and equal protection analysis to the federal constitution, unpersuaded that the state constitution affords any greater protections." *ACLU of N.M.*, 2006-NMCA-078, ¶ 18.

**Application of the Tort Claims Act Cap on Damages Did Not Violate the Wachockis' Rights to Substantive Due Process**

{35}    The premise behind the Wachockis' substantive due process argument is that the cap inhibits the ability of all individuals to hold their government fully accountable. They argue that the ability to hold the government fully accountable is a "fundamental right," based on several state constitutional provisions relating to popular sovereignty, right to self-government, inherent rights, and victim's rights. The Wachockis argue that, when read together, these provisions create a fundamental right to recover damages against the government in an amount at least in proportion with inflation. They argue that, in order for the cap to have the same value as it did in 1991, the $400,000 per person cap should be valued at $603,275 and that the failure to increase the cap reduces the waiver's effectiveness in deterring governmental negligence. Notwithstanding these arguments, even assuming that a right to recover compensation in proportion with inflation exists, it does not rise to the level of a fundamental right falling within the protection of substantive due process.

{36}    Federal substantive due process protection extends only to a narrow and limited set of fundamental rights, which include the "rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citations omitted). The Supreme Court has also "assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment." *Id.* (citation omitted).

{37}    The Supreme Court has been reluctant to expand substantive due process protections beyond these areas, stating that it will exercise the "utmost care" when asked to break new ground in this area of law out of concern that there are no real outer constraints. *Id.* (internal quotation marks and citation omitted). The Wachockis make no argument that the right to full recovery against the government in tort falls within one of the recognized areas protected under substantive due process. Therefore, we conclude that the Wachockis have suffered no substantive due process violation.

**The Tort Claims Act Cap on Damages Does Not Violate Equal Protection**

{38}    The Wachockis argue that the cap on damages creates two classes of individuals receiving unequal treatment: (1) victims with more serious injuries exceeding $400,000 in damages versus victims with minor injuries equal to or less than $400,000, where the latter receive full compensation and the prior do not; and (2) victims of non-government tortfeasors who may be fully compensated and victims of government tortfeasors whose compensation is limited by the cap. Assuming that these represent classes of persons similarly situated but treated differently—such that equal protection is properly invoked—we find no constitutional infirmity.

10

**{39}** When a statute is challenged on equal protection grounds, "one of three levels of review is applied, depending on either the rights affected . . . or the status or group of people it affects." *ACLU of N.M.*, 2006-NMCA-078, ¶ 19. Strict scrutiny requires the most exacting review and applies only when the violated interest is a fundamental right or civil liberty guaranteed by the constitution or where a legislative classification involves a suspect classification, such as race or ancestry. *Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 16, 125 N.M. 721, 965 P.2d 305 (*Trujillo II*). Under strict scrutiny, the burden is on the government to prove that the legislation at issue is narrowly tailored to accomplish a compelling governmental interest. *ACLU of N.M.*, 2006-NMCA-078, ¶ 19. Intermediate scrutiny is less exacting and applies when a violated interest is important but not fundamental, or when the interest involves a sensitive but not suspect class. *Id.* Under intermediate scrutiny, the government must prove that the legislation at issue is substantially related to an important governmental interest. *Id.* Finally, rational basis review applies when the interest at issue is neither a fundamental nor important right, or when a legislative classification does not involve a suspect or sensitive class. *Id.* Under rational basis, the challenger has the burden to demonstrate that the statute is not rationally related to a legitimate governmental interest. *Id.*

**{40}** The Wachockis argue that the cap on damages is unconstitutional even under the rational basis standard, but they urge us to apply intermediate scrutiny. They argue that the ability to hold ones "government responsible and accountable when it acts to harm . . . must be deemed a fundamental right." We recognize that if a fundamental right were at issue, strict scrutiny would be proper. Nonetheless, the Wachockis urge us to apply only intermediate scrutiny on this issue. We cannot do so because application of anything other than rational basis review would conflict with established Supreme Court precedent.

**{41}** In *Trujillo II*, our Supreme Court gave detailed consideration to the question of the proper standard of review to be applied to a challenge to the cap on damages under Section 41-4-19. *Trujillo II*, 1998-NMSC-031, ¶¶ 26-32. There, the Court applied intermediate scrutiny to a constitutional challenge of the cap, but its holding was clearly limited only to the facts of that case, based on the doctrine of law of the case, which is inapplicable here. *Id.* ¶ 13. With respect to the case at hand, the Court gave clear guidance, stating that "[r]ational basis scrutiny is the appropriate equal protection analysis to be employed." *Id.* ¶ 26. "The interests at stake in a challenge of the TCA cap are of an economic or financial nature, and this Court is unconvinced that . . . equal protection rights are affected so substantially that intermediate scrutiny is warranted." *Id.* Therefore, neither intermediate nor strict scrutiny is proper, and we consider the Wachockis' arguments only to determine whether the cap on damages bears a rational relation to some important governmental purpose.

**{42}** The Wachockis argue that, even if the damages cap was constitutional at the time when it was passed, Section 41-4-19 is now irrational because it does not include any cost-of-living increases. The Wachockis' arguments in support of this position were stated in our substantive due process analysis, and we do not restate them here. Although we appreciate the weight of the arguments, we cannot conclude that the cap now lacks a rational basis.

**{43}** In *Trujillo v. City of Albuquerque (Trujillo I)*, our Supreme Court took it as "self-evident that preservation of the public treasury constitutes an important governmental interest." 110 N.M. 621, 628, 798 P.2d 571, 578 (1990) (internal quotation marks and citation omitted). Furthermore,

11

imposition of a fixed cap, as opposed to one that fluctuates as a percentage of damages, bears a rational relationship to the governmental need to protect against the danger of a catastrophic judgment and also provides a basis for rational fiscal planning. *See State ex rel. Colo. State Claims Bd. v. DeFoor*, 824 P.2d 783, 788 (Colo. 1992) (en banc). Even if a better system of accomplishing these goals could be formulated, we agree with the Colorado court's analysis in *DeFoor* when it stated that "it is not the function of [the courts] to rewrite legislation; the power to change the present scheme rests with the [legislature]." *Id.* at 787 n.3 (internal quotation marks and citation omitted). Thus, we conclude that the current fixed cap is rationally related to the legislative goal of protecting the public treasury.

**The Tort Claims Act Cap on Damages Does Not Encroach On The Right to Trial by Jury or the Separation of Powers Clause**

{**44**}    The Wachockis argue that the TCA cap infringes on their constitutional rights to access the courts and to trial by jury because it interferes with the jury's—or other judicial fact finder's—right to determine damages. We are unconvinced that either of these rights have been impaired. First, the Wachockis never asserted their right to trial by jury, and there is no argument that they would have been denied a jury had one been requested. Accordingly, the right was waived and cannot be asserted for the first time on appeal. Rule 1-038(D) NMRA; *see Richardson v. Carnegie Library Rest., Inc.*, 107 N.M. 688, 691-92, 763 P.2d 1153, 1156-57 (1988) (declining to consider whether liability limits under the Dramshop Act violated the right to a jury trial where the complaining party never requested a jury trial), *overruled on other grounds by Trujillo II*, 1998-NMSC-031, ¶ 18.

{**45**}    In addition, the Wachockis fail to show how the right of access to the courts or the right to a jury incorporate a right to maximum recovery. In *Trujillo II*, the Court concluded that the constitutional right to access the courts did not create a right to unlimited recovery against the government. *Id.* ¶ 20. The Court went on to say that "nothing within New Mexico's constitutional provision itself purports to control the scope or substance of remedies afforded." *Id.* ¶ 23. We fail to see how the right to a jury—which can be seen as a component of the broad right to access—changes the analysis of or the result reached in *Trujillo II. See Bd. of Educ. v. Harrell*, 118 N.M. 470, 481, 882 P.2d 511, 522 (1994) (stating New Mexico's right to trial by jury "merely preserves the common law right to jury trial and does not create a new or broader right." (internal quotation marks and citation omitted)); *Sandoval v. Chrysler Corp.*, 1998-NMCA-085, ¶¶ 10, 12, 125 N.M. 292, 960 P.2d 834 (recognizing that an excessive jury award may be reduced at the discretion of the district court); *Carlile v. Continental Oil Co.*, 81 N.M. 484, 486, 468 P.2d 885, 887 (Ct. App. 1970) (concluding that reasonable regulatory provisions, even if "different in form and substance from those in effect at the adoption of the Constitution, do not abridge, limit or modify the right [to a jury]").

{**46**}    The Wachockis' final constitutional argument is that the fixed cap on damages impermissibly infringes on the authority of the judicial branch to regulate court practices, procedures, and verdicts. Relying on two cases from other jurisdictions, they argue that the cap forces judges to grant a compulsory, predetermined remittitur. The Wachockis first cite *Kansas Malpractice Victims Coalition v. Bell*, 757 P.2d 251, 253 (Kan. 1988), *overruled in part by Bair v. Peck*, 811 P.2d 1176 (Kan. 1991), which dealt with a cap limiting recovery in medical malpractice actions. They also cite *Best v. Taylor Machine Works*, 689 N.E.2d 1057, 1063 (Ill. 1997), which dealt with a statute capping

recovery for all "non-economic" injuries. Neither of these cases is persuasive because they both deal with damage caps favoring private defendants and thus present examples of the legislature regulating judicial processes that are otherwise founded squarely within the common law. *See Marrujo v. N.M. State Highway Transp. Dep't*, 118 N.M. 753, 761, 887 P.2d 747, 755 (1994) (stating that "[t]he right to sue the government is a statutory right and the [L]egislature can reasonably restrict that right"); *see also Best*, 689 N.E.2d at 1072 n.3 (stating that when considering rights founded in statute, the "[L]egislature's right to limit the maximum recovery could not be questioned").

{47}     The Wachockis overstate the breadth of the separation of powers clause. Citing *Ammerman v. Hubbard Broadcasting, Inc.*, 89 N.M. 307, 312, 551 P.2d 1354, 1359 (1976), they argue generally that the Legislature lacks power to regulate practice and procedure in our state courts.    In *Ammerman,* our Supreme Court found a separation of powers issue because the legislature had imposed a standard of review in certain criminal cases entirely inconsistent with the standard of review required by the Court's appellate rules.   Where legislation does not create such a direct conflict, "the Legislature is not categorically prohibited from enacting legislation affecting practice and procedure." *Grassie v. Roswell Hosp. Corp.*, 2008-NMCA-076, ¶ 10, 144 N.M. 241, 185 P.3d 1091.  In order to determine whether the TCA cap violates separation of powers, we must determine whether it is in irreconcilable conflict with the power of the courts to grant remittitur.

{48}     A district court may enter "[a]n order granting a remittitur or, in the alternative a new trial, . . . [where] the jury's award of damages is so grossly out of proportion to the injury received as to shock the conscience [of the court]." *Sandoval*, 1998-NMCA-085, ¶ 9 (alterations omitted) (internal quotation marks and citation omitted).  The court determines whether an award is excessive so as to shock the conscience by considering:  "(1) whether the evidence, viewed in the light most favorable to [the] plaintiff, substantially supports the award[,] and (2) whether there is an indication of passion, prejudice, partiality, sympathy, undue influence or a mistaken measure of damages on the part of the fact finder."  *Id.* (internal quotation marks and citation omitted).

{49}     The TCA cap, as a limit on damages for a cause of action created by statute, does not interfere with "the judicial machinery administered by the courts for determining the facts upon which the substantive rights of the litigant rest and are resolved." *Ammerman*, 89 N.M. at 310, 551 P.2d at 1357. Unlike *Ammerman*, where the legislative rule directly eclipsed the Court's authority, the TCA cap does not eclipse a district court's authority to order remittitur.  We agree with the conclusion of the district court that the TCA cap is based on a broad legislative policy, rather than on any consideration of whether a damages award is unsupported by evidence or the result of some undue influence.  Such considerations remain within the authority of the district court and the TCA cap does not prevent a district court from ordering remittitur under proper circumstances.  Thus, we are unconvinced that the cap creates a separation of powers violation.

**Loss of Consortium**

{50}     Jason's brother, Bill Wachocki (Bill), cross appeals the district court's denial of his loss of consortium claim, arguing that he and his brother shared a close relationship meeting the requirements for recovery.  As a preliminary matter, we note that damages for loss of consortium may be recovered under the Section 41-4-2(A) waiver of sovereign immunity. *Brenneman v. Bd.*

13

*of Regents of Univ. of N.M.*, 2004-NMCA-003, ¶ 19, 135 N.M. 68, 84 P.3d 685. It is a "method of compensation for one who has suffered the loss of a significant relational interest." *Castillo v. City of Las Vegas*, 2008-NMCA-141, ¶ 25, 145 N.M. 205, 195 P.3d 870 (internal quotation marks and citation omitted). Generally, a party may "recover for loss of consortium if the evidence shows that their relationship[] with [the d]ecedent was sufficiently close financially, socially, or both, and if it was foreseeable that the injury to [the d]ecedent would harm the relationship[]." *Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't*, 2003-NMCA-125, ¶ 14, 134 N.M. 492, 79 P.3d 836.

**{51}** Our Supreme Court has outlined factors tending to prove or disprove the forseeability of harm to a relational interest in the context of minor children. For example, in *Fernandez v. Walgreen Hastings Co.*, 1998-NMSC-039, 126 N.M. 263, 968 P.2d 774, the Court concluded that a grandmother might be able to recover for loss of consortium where she had been the guardian, caretaker, and provider of parental affection to her deceased twenty-two-month-old granddaughter. Under those facts, the Court stated that a loss of consortium claimant could be foreseeable given that:

> (1) the victim was a minor; (2) the plaintiff was a familial care-taker, such as a parent or grandparent, who lived with and cared for the child for a significant period of time prior to the injury or death; (3) the child was seriously physically injured or killed; and (4) the plaintiff suffered emotional injury as a result of the loss of the child's companionship, society, comfort, aid, and protection.

*Id.* ¶ 31.

**{52}** The Court has also outlined factors, although not exhaustively, that may be considered in determining the existence of a sufficiently close relational interest in domestic partnerships. In *Lozoya v. Sanchez*, 2003-NMSC-009, 133 N.M. 579, 66 P.3d 948, *abrogated on other grounds by Heath v. La Mariana Apartments*, 2008-NMSC-017, ¶ 21, 143. N.M. 657, 180 P.3d 644, the Court concluded that two unmarried persons were not precluded from recovering for loss of consortium where they had lived in a spousal-type relationship for over thirty years, had three children together, lived in a jointly owned home, shared a last name, and filed joint tax returns. *Id.* ¶ 9. The Court stated that relevant factors indicating whether or not such persons had an intimate familial relationship giving rise to a claim for loss of consortium were: duration of the relationship, mutual dependence, common contributions to a life together, shared experience, living in the same household, financial support and dependence, emotional reliance on each other, qualities of their day-to-day relationship, and the manner in which they related to each other in attending to life's mundane requirements. *See id.* ¶ 27.

**{53}** This Court has also been unwilling to foreclose, as a matter of law, the ability to recover for other types of lost relationships. In *Fitzjerrell*, the surviving parents and sisters of a deceased twenty-five-year-old man attempted to recover for the loss of their relational interest with their son and brother. We concluded that they were not legally barred from asserting their claims. 2003-NMCA-125, ¶ 13. Such a determination can properly be made only after considering foreseeability and "mutual dependence" factors such as those outlined in *Lozoya*. *Fitzjerrell*, 2003-NMCA-125, ¶ 12. This approach "allows inquiry into the nature and quality of the relationship to determine whether a claim is compensable rather than relying on the existence of a particular legal relationship

14

as a dividing point." *State Farm Mut. Auto. Ins. Co. v. Luebbers*, 2005-NMCA-112, ¶ 44, 138 N.M. 289, 119 P.3d 169.

{54}    We have not previously reviewed a fully litigated case involving the loss of a sibling. Although not directly on point, we find both *Fernandez* and *Lozoya* helpful in our analysis of whether Bill has met the burden of showing:  (1) that it was foreseeable that he would be harmed as a result of the injury to Jason, and (2) that his and Jason's relationship was sufficiently close. We concur with the district court that Bill did not meet this burden, noting that the status of the two as brothers is not itself determinative but provides some evidence of the existence of a relational interest. *Lozoya*, 2003-NMSC-009, ¶ 19.

{55}    In *Fernandez*, our Supreme Court determined that a sufficient level of mutual dependence is foreseeable in a relationship between a toddler and her primary care giver.  Clearly, a small child depends almost entirely on her primary care giver to provide for her needs.  Similarly, it can be expected that one who assumes such a role in the life of a small child is largely consumed by the responsibility and that the obligation to the child becomes a defining component in one's life.  Bill points to no evidence that would demonstrate the foreseeability of an equivalently powerful bond between him and his then twenty-two-year-old brother, Jason. *See Solon v. WEK Drilling Co.*, 113 N.M. 566, 571, 829 P.2d 645, 650 (1992) (concluding that it was not foreseeable that a twenty-five-year-old would live with his parents, enjoy a close relationship with them, and contribute to their economic support).

{56}    Even assuming that the relational injury to Bill was foreseeable, Bill has not demonstrated that the relationship with his brother was so mutually dependent that he should be allowed to recover for loss of consortium.  The fact that the two shared an apartment for several months and split bills does not demonstrate significant "mutual dependence [or] common contributions to a life together" as contemplated in *Lozoya*, 2003-NMSC-009, ¶ 27 (internal quotation marks and citation omitted). For example, in *Lozoya*, the claimant had shared a jointly owned home with the injured party for fifteen years, and they had been companions for over thirty.  Conversely, a roommate situation between two young brothers is presumably much more temporary in nature and, absent more, it is hard to envision how these unremarkable facts contributed toward the development of a mutual life together.

{57}    Finally, even after adding facts that the two shared legal status as brothers, shared friendship, and socialized, the lost relational interest does not rise to the level of what is required to prove a claim for loss of consortium.  These facts do not describe significant mutual dependence in the form of emotional reliance on each other, the qualities of their day-to-day relationship, or the manner in which they related to each other in attending to life's mundane requirements in the same sense as the life-defining types of relationships previously recognized.  To hold otherwise would be to open up broad liability based essentially exclusively on familial relationship rather than other qualities exemplified by the "mutual dependence" factors described in *Lozoya*.  This opinion should not be construed as a retreat from current New Mexico law on who may recover for loss of consortium. We recognize that under some set of facts, recovery by a sibling may be proper, but this is not that case.  The factual basis simply falls short.

**CONCLUSION**

15

**{58}**    For the foregoing reasons, we affirm the decision of the district court.

**{59}    IT IS SO ORDERED.**

_____
                                    **MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**


_____
**CYNTHIA A. FRY, Chief Judge**


_____
**RODERICK T. KENNEDY, Judge**

**Topic Index for** _Wachocki v. Bernalillo Co. Sheriff's Dept._**, No. 27,761**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-AP | Appellate Rules and Procedure |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DP | Due Process |
| CT-EP | Equal Protection |
| CT-IM | Immunity |
| CT-RR | Rational Relationship Test |
| CT-SP | Separation of Powers |
| CT-TJ | Trial by Jury |
| | |
| **GV** | **GOVERNMENT** |
| GV-SI | Sovereign Immunity |
| | |
| **NG** | **NEGLIGENCE** |
| NG-CN | Comparative Negligence |
| NG-FR | Foreseeability |
| NG-WG | Wrongful Death |
| | |
| **RE** | **REMEDIES** |
| RE-AR | Additur and Remittitur |
| RE-CD | Compensatory Damages |
| RE-DG | Damages, General |
| RE-LC | Loss of Companionship |
| RE-LO | Loss of Consortium |
| | |
| **TR** | **TORTS** |
| TR-FS | Foreseeability |
| TR-LC | Loss of Consortium |

| | |
|---|---|
| TR-NG | Negligence |
| TR-PE | Public Employee Torts |
| TR-TA | Tort Claims Act |
| TR-WD | Wrongful Death |