# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2021-NMCA-007**

**Filing Date: September 28, 2020**

**No. A-1-CA-36781**

**MELISSA R. VELASQUEZ,**

       Plaintiff-Appellee/Cross-Appellant,

v.

**REGENTS OF NORTHERN
NEW MEXICO COLLEGE,**

       Defendant-Appellant/Cross-Appellee.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**Francis J. Mathew, District Judge**

Certiorari Denied, February 12, 2021, S-1-SC-38542. Released for Publication May 4, 2021.

Moody & Stanford, P.C.
Christopher M. Moody
Albuquerque, NM

for Appellee

Long, Komer & Associates, P.A.
Mark E. Komer
Jonas M. Nahoum
Santa Fe, NM

for Appellant

## OPINION

**IVES, Judge.**

**{1}** Plaintiff Melissa Velasquez sued Defendant Northern New Mexico College pursuant to the New Mexico Whistleblower Protection Act (WPA), NMSA 1978, §§ 10-16C-1 to -6 (2010). A jury found that Defendant violated the WPA and awarded damages to compensate Plaintiff for back pay and emotional distress, and the district

court ordered Defendant to reinstate Plaintiff. The district court denied Defendant's motion for a new trial, remitted the damages awards, and denied Plaintiff's request for post-judgment interest on the back pay. Defendant appeals, and Plaintiff cross-appeals. Defendant argues that (1) the evidence does not suffice to support the jury's verdict with respect to the elements of protected conduct and retaliation, (2) the district court erroneously denied Defendant's motion for a new trial, (3) the district court erroneously ordered Defendant to reinstate Plaintiff, and (4) the WPA does authorize the award of back pay. Plaintiff argues that the district court erred by (5) ordering remittitur and (6) denying post-judgment interest on the back pay. We reverse the remittitur and post-judgment interest orders but otherwise affirm.

## PROCEDURAL BACKGROUND

{2}      At trial, Plaintiff sought to prove that Defendant removed her from her position as director of Defendant's campus in El Rito, New Mexico (El Rito campus), transferred her to another position, and then terminated her employment in retaliation for her communications to Defendant's administrators about Defendant's failure to approve expenditures necessary for the successful implementation of a plan to revitalize the El Rito campus. Plaintiff's position is that she communicated to Defendant that Defendant was "jeopardizing the entire revitalization project at El Rito" by not making relatively small expenditures, "that hundreds of thousands of federal tax dollars were at risk of being totally wasted," and that Defendant's  actions prevented "the expenditure of federal funds that had already been approved for use[.]" Specifically, according to Plaintiff, the campus revitalization depended on (1) completing various federally funded laboratories and (2) funding logistical support necessary for events that Plaintiff had scheduled at the campus and for events she hoped to arrange. Plaintiff testified that she communicated to Defendant about the significant consequences of not funding these essential components of the revitalization effort and that Defendant retaliated against her by removing her from her position as campus director and later terminating her employment. Plaintiff also testified that her termination caused her to lose income and benefits and suffer emotional harm.

{3}      Defendant argued to the jury that the WPA does not protect the types of communications Plaintiff made. Defendant also contended that it was not retaliating against Plaintiff when it transferred her to a new position and terminated her employment, and that it had legitimate business reasons for both actions. According to Defendant's witnesses, Defendant transferred Plaintiff based on her poor performance and terminated her based on a reduction in force.

{4}      Defendant repeatedly asked the district court to conclude that Plaintiff's evidence was legally insufficient. At the close of Plaintiff's case, Defendant moved for judgment as a matter of law, arguing, among other things, that a reasonable jury could not find in favor of Plaintiff on the elements of protected conduct, retaliation, and back pay. The court denied the motion. Defendant then objected to instructing the jury on liability and damages and, at the close of the evidence, renewed its motion for judgment as a matter of law. The court allowed Plaintiff's claim to go to the jury.

**{5}** The jury concluded that Defendant had violated the WPA and returned a verdict for Plaintiff. It found by special verdict form that Plaintiff had communicated to Defendant about the occurrence of an improper act, that there was a reasonable basis in fact for the improper act, and that Defendant retaliated against Plaintiff because of a communication about that improper act. The jury awarded $239,451 to compensate Plaintiff for back pay for the two years and ten months between her termination and the time of trial and $180,000 to compensate her for emotional distress.

**{6}** After the district court entered a judgment based on the jury's verdict, the parties filed several motions. The district court denied Defendant's motion for new trial but granted its motion for remittitur, reducing the damages for back pay to $84,513 and for emotional distress to $90,000. The district court granted Plaintiff's motion for reinstatement but denied her request for post-judgment interest on the back pay damages. It then entered an amended judgment reflecting these rulings.

## DISCUSSION

### I. Substantial Evidence Supports the Jury's Verdict

**{7}** Defendant argues that Plaintiff did not introduce sufficient evidence that (1) her communications with college administrators constituted conduct that the WPA protects and (2) Defendant was retaliating against her when Defendant removed her from her position as campus director and transferred her to a new position and when it ultimately terminated her employment.

**{8}** Our task is to "review the evidence to determine whether there is evidence that a reasonable mind would find adequate to support a conclusion." *Dart v. Westall*, 2018-NMCA-061, ¶ 6, 428 P.3d 292 (internal quotation marks and citation omitted). We begin our analysis with the facts, "view[ing] the evidence in a light most favorable to the prevailing party and disregard[ing] any inferences and evidence to the contrary." *Id.* (internal quotation marks and citation omitted). We "defer to the jury's determination regarding the credibility of witnesses and the reconciliation of inconsistent or contradictory evidence." *Id.* (internal quotation marks and citation omitted). We then apply the law set forth in the jury instructions, which are not challenged on appeal and are therefore the law of the case. *Id.* To the extent that Defendant's challenge to the verdict requires us to interpret the WPA, our review is de novo. *See Cates v. Mosher Enters., Inc.*, 2017-NMCA-063, ¶ 14, 403 P.3d 687 ("We review interpretation of statutory provisions de novo.").

### A. Summary of Facts

**{9}** Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could have found the following facts. Nancy Barcelo, President of Northern New Mexico College, had concerns about the El Rito campus, and one of the provisions of President Barcelo's employment contract involved revitalization of the campus. President Barcelo asked Plaintiff, who was working as Director of Adult Basic Education at the time, and

Dr. James Biggs, the college's Director of Environmental Studies, to draft a plan for revitalizing the campus by creating an Innovation Center.

{10}     Plaintiff and Dr. Biggs did so and, also at President Barcelo's request, presented a preliminary five-year plan for the Innovation Center to the college's Board of Regents and Dean's Council. Under the plan, the Innovation Center would include the El Rito Agroecology and Biological Research Station; the New Mexico Cultural Heritage, Sustainable Tourism, Ecological Education Center; the Northern New Mexico Land Policy and Acéquia Center; and the Hospitality and Culinary Education Center. The college would make the centers available to students, community members, and local agencies. The Innovation Center would also include laboratories devoted to soil testing, fire simulation, geographic information systems, a sustainable kitchen and greenhouse, and hazardous materials. Money to establish the labs would come from grants. As part of their presentation, Plaintiff and Dr. Biggs explained that the growth of the Innovation Center depended on Defendant committing to multi-year core funding, developing revenue center programs to strengthen the center's financial viability, building grant income, and developing and expanding earned income revenue streams.

{11}     After Plaintiff and Dr. Biggs presented the plan, the Board of Regents indicated that it fully supported the initiative and was excited about the possibility of moving forward immediately. Defendant directed Plaintiff to implement the plan and, in February 2012, promoted her to Director of the El Rito campus.

{12}     Through Plaintiff's efforts, Defendant obtained a federal grant, which included $265,000 for the labs at the El Rito campus. Defendant also obtained a state-funded grant for a wildland fire simulation lab. Some of the grant money was allocated for improvements to the college's greenhouse laboratory and kitchen, including purchases of a compost machine and a $100,000 greenhouse. As various labs approached completion, Plaintiff and Dr. Biggs increased the number of student groups visiting the campus. Because these groups paid the college for food and lodging, the college's revenue from bringing groups to the El Rito campus grew to at least twice as much as it had been before the revitalization efforts began.

{13}     Defendant recognized Plaintiff's accomplishments and rewarded her for them. One witness testified that President Barcelo introduced Plaintiff "as a rising star at the institution" during a presentation Plaintiff made to the campus community in the summer of 2012. In April 2013, Plaintiff received a positive review from her supervisor, Dr. Anthony Sena, who served as Defendant's Provost at that time. Dr. Sena gave Plaintiff an average score of 4.4 out of 5. Under Defendant's rating system, a score of 4 means "[c]ommendable," which signifies that an employee's "[a]ccomplishments exceed [the] expected level or essential requirements," and a score of 5 means "[o]utstanding," which signifies that an employee "[c]ontinuously exceeds expectations for the position." Defendant then renewed Plaintiff's contract for the next academic year, which began on July 1, 2013, increasing her salary from $60,000 to $70,700.

**{14}**    In July 2013, Plaintiff met with Domingo Sanchez, the college's Vice President for Finance and Administration, to discuss budgetary matters and sources of funding. During the meeting, Plaintiff informed Mr. Sanchez that in order to carry out scheduled activities at the El Rito campus, it would be necessary for Defendant to budget $5,000 to pay temporary kitchen staff. Mr. Sanchez became angry and shouted at Plaintiff, ordering her to leave his office and telling her that the college did not need the kitchen staff, Plaintiff, or the El Rito campus. Mr. Sanchez ended the meeting by informing Plaintiff that if she told President Barcelo about his conduct, she would not believe Plaintiff.

**{15}**    Immediately after the meeting ended, Plaintiff went next door to Dr. Sena's office and recounted to Dr. Sena what had happened with Mr. Sanchez. Dr. Sena apologized for Mr. Sanchez's behavior. But when Plaintiff told Dr. Sena that she wanted to report Mr. Sanchez and file a grievance, Dr. Sena "became nervous[,]" telling Plaintiff that she could either "put up with it" or "get out."

**{16}**    In August 2013, Plaintiff reported her interactions with Mr. Sanchez and Dr. Sena to President Barcelo. President Barcelo begged Plaintiff not to file a grievance and promised Plaintiff that she would make sure that the incident would never be repeated. Plaintiff explained to President Barcelo that the lack of funding for kitchen staff would make it impossible to accommodate groups at the El Rito campus; that cancelling the events for those groups would result in the labs not being utilized; that the failure to use the labs would result in the federal grant criteria not being met; and that the money already spent on the labs would go to waste.

**{17}**    One event at risk of being canceled was a weeklong youth camp at the El Rito campus to be held in coordination with the United States Forest Service (USFS) in November 2013. The curriculum for the camp included classes about the environment, biology, and wildland fire science. Developing an official partnership with the USFS was part of the Innovation Center plan, and the youth camp was one facet of an ongoing relationship with the USFS that had been developed. Under the contract between Defendant and the USFS, Defendant would contribute $3,000 and receive $45,000 in revenue. The contract required Defendant to, among other things, pay for lodging, meals, and refreshments for all camp participants.

**{18}**    In September 2013, Plaintiff submitted two $5,000 purchase orders for materials that were necessary to complete the greenhouse and student workstations at the El Rito campus. Plaintiff explained to Dr. Sena that grant money had been allocated for these expenditures and that, according to the grant office, the money would need to be spent by September 30, 2013. Plaintiff informed Dr. Sena that if the labs were not finished and utilized, as the terms of the federal grant required, "[t]he repercussions could be severe for the [college]." Nevertheless, Defendant did not approve the purchase orders, and the greenhouse and workstations were consequently not completed.

**{19}**    On October 8, 2013, Plaintiff sent emails to Dr. Sena and other employees of Defendant regarding the approval of expenditures that were necessary to fulfill

Defendant's obligations to groups that had booked events at the El Rito campus. In one of the emails, Plaintiff explained that if Defendant did not approve the expenditures, which included the two $5,000 purchase orders for equipment, it would be necessary to cancel scheduled events. Plaintiff stated that "the repercussions [could] be severe." In another email, Plaintiff explained that "the VP for Finance and Administration[, Mr. Sanchez,] ha[d] been unresponsive" and that, "until some action [was] taken, [the] college [would] be imp[ac]ted negatively."

{20}    Less than two weeks after Plaintiff sent these emails, Dr. Sena issued letters of reprimand and reassignment to Plaintiff. In the letters, Dr. Sena stated that Plaintiff was being immediately relieved of her duties at the El Rito campus and advised her that "future transgressions and/or violations will result in further disciplinary action up to and including termination." One of the problems identified in the letters was Plaintiff signing the USFS contract on behalf of Defendant without authorization. However, the job description for the position of Director of the El Rito campus gave Plaintiff the authority to approve such agreements, she had done so in the past with Defendant's knowledge and without Defendant raising any concerns, and Defendant's finance office was aware of the USFS agreement and knew Plaintiff was going to sign it but did not object until after she signed it. Defendant also relied on an allegation that Plaintiff had allowed faculty members to stay overnight at the El Rito campus free of charge, but no policy prohibited Plaintiff from doing so. Finally, Defendant accused Plaintiff of failing to attend required meetings. However, with the exception of two periodic meetings that Plaintiff alternated between because of a conflict in their timing, Plaintiff had gone to every meeting that she had been told to attend.

{21}    Defendant's removal of Plaintiff was inconsistent with Defendant's progressive discipline policy, as set forth in its staff handbook, under which less severe discipline would have been warranted. Defendant's policy provided that discipline imposed for performance deficiencies would ordinarily begin with a verbal or written warning and increase incrementally in severity if concerns were not resolved after an opportunity for correction. But Defendant removed Plaintiff from her position at the El Rito campus without giving her prior notice of any performance issues or any opportunity to address those issues, immediately imposing what Dr. Sena testified at trial was "harsh" discipline.

{22}    The letters of reprimand and reassignment directed Plaintiff to report to an office at Defendant's Española campus, where her duties would involve the continuing education program. Defendant initially informed Plaintiff that her new job title was Coordinator of Continuing Education, which would have been a demotion because coordinator was a lower position than director. When Plaintiff pointed this out, Defendant changed her title to Director of Continuing Education, which was the title of a position that Defendant had eliminated just a few months earlier. When Plaintiff began in her new position, her job duties were essentially the same as the duties that another employee was already performing, Defendant did not assign Plaintiff any projects or tasks, Defendant failed to properly equip her office, and Dr. Sena hardly communicated with her.

**{23}** Despite Plaintiff's efforts to do her new job well, Dr. Sena remained critical in the communications he did make. He issued another reprimand letter in November 2013, purportedly for failure to obtain authorization to take annual leave, although Plaintiff had submitted leave request forms. Dr. Sena also sent Plaintiff an email falsely accusing her of not going to work.

**{24}** In the spring of 2014, Plaintiff received two performance evaluations from Dr. Sena. The first was for the final four months of Plaintiff's tenure as Director of the El Rito campus. The second was for the time she had spent as Director of Continuing Education for the Española campus. The average scores for these two evaluations were 1.4 and 2.2, respectively. Under Defendant's system, a score of 1 is "unsatisfactory," meaning that "[p]erformance is substandard," that the employee "requires a high degree of supervision and direction," that "[d]eficiencies are clearly evident" and that "specific, remedial action is required[.]" A score of 2 is "needs improvements," meaning that the employee's "[p]erformance does not meet all essential requirements of the job[,]" and that the employee's "work requires frequent guidance and checking." Plaintiff testified that the scores she received did not accurately reflect her job performance.

**{25}** On May 6, 2014, Defendant sent Plaintiff a letter informing her that, because it was implementing a Reduction in Force (RIF) that included her position, she would not be reemployed during the upcoming fiscal year. Plaintiff was terminated effective June 30, 2014, when her contract expired.

**B.      Substantial Evidence Supports the Jury's Determination That Defendant Retaliated Against Plaintiff for Engaging in Conduct Protected by the WPA**

**{26}** We address Defendant's challenges to (1) protected conduct and (2) retaliation.

**1.      Protected Conduct**

**{27}** The WPA forbids public employers from, among other things, "tak[ing] any retaliatory action against a public employee because the public employee . . . communicates to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act[.]" Section 10-16C-3(A). By creating a cause of action against employers who retaliate against an employee for engaging in conduct that the WPA protects, § 10-16C-4(A), the WPA "promotes transparent government and the rule of law." *Flores v. Herrera*, 2016-NMSC-033, ¶ 9, 384 P.3d 1070.

**{28}** With respect to whether the WPA protects Plaintiff's communications to Defendant, the district court instructed the jury that Plaintiff had the burden of proving that she "communicated to [D]efendant about an 'unlawful or improper act' . . . related to [the] use of grant funds" and "[t]hat a reasonable basis exist[ed] in fact of an 'improper act' by [D]efendant." *See* § 10-16C-2(A) (providing that " 'good faith' means that a reasonable basis exists in fact as evidenced by the facts available to the public employee"); *Young v. Merit Sys. Prot. Bd.*, 961 F.3d 1323, 1328 (Fed. Cir. 2020)

("Whether an individual has such a reasonable belief is determined by an objective test: whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee would reasonably conclude that the actions of the government evidence wrongdoing[.]"). The instructions defined "improper act," in pertinent part, as "a practice, procedure, action or failure to act on the part of a public employer that . . . constitutes gross mismanagement [or] a waste of funds[.]"[1] *See* § 10-16C-2(E)(3) (defining "unlawful or improper act[,]" in pertinent part, as a public employer's "practice, procedure, action or failure to act" that "constitutes gross mismanagement [or] a waste of funds"). We address the two types of improper conduct at issue here—a waste of funds and gross mismanagement—in turn.[2]

### a.     A Waste of Funds

{29}    The evidence sufficed to prove that Plaintiff was communicating in good faith with Defendant about "a waste of funds" when she alerted President Barcelo, Dr. Sena, and Mr. Sanchez to the importance of making the requested expenditures for the revitalization of the El Rito campus. A waste of funds can be either an "action" or a "failure to act," § 10-16C-2(E), and, since nothing in the WPA suggests that the Legislature intended the contrary, we accord the phrase "waste of funds" its broad ordinary meaning, construing it to refer to the "squander[ing]" of funds—to their "careless" expenditure or use—or to "allow[ing funds] to be used inefficiently or become dissipated." *Waste*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/ dictionary/waste  (last visited Aug. 6, 2020). The evidence established that substantial funds had already been spent in pursuing the unfinished revitalization project, and further funding contingent on group visits and grant funding were integral to the project's success. Cancelling the visits, Plaintiff warned, would deprive the El Rito campus of a revenue stream. Plaintiff further informed her superiors that if Plaintiff's funding requests were not approved, the equipment that had been purchased for the project would go unused, and Defendant would violate the criteria under which it had obtained the project funds. The essence of Plaintiff's communications was that a failure to approve the comparatively modest funding requests she was making would endanger the continued success of the revitalization project. The facts that Plaintiff was aware of gave her a reasonable basis to believe that Defendant's refusal to authorize the expenditures would waste funds, including the federal grant money Defendant had spent to buy equipment that would remain unused, the grant money that would remain unspent, and the money that Defendant would not receive if the events at the El Rito campus did not occur, such as the $45,000 in revenue from the USFS for the youth camp scheduled for the fall of 2013.

{30}    Defendant argues that the subject matter of Plaintiff's communications did not qualify as a waste of funds as a matter of law, citing federal precedent that includes the

---

1Tracking the statute, the instruction also included "abuse of authority" in its definition of "improper act," but Plaintiff did not urge the jury to find in her favor based on a theory that Defendant abused its authority.
2Defendant frames these issues as purely legal ones that we review entirely de novo. However, as we have explained, although we review the interpretation of the WPA de novo, when applying the WPA to the evidence, we view the evidence in the light most favorable to the verdict.

following definition: "a more than debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue to the government." *Nafus v. Dep't of Army*, 57 M.S.P.R 386, 393 (1993), *overruled on other grounds by Frederick v. Dep't of Justice*, 65 M.S.P.R. 517, 530-31 (1994); *accord Embree v. Dep't of Treasury*, 70 M.S.P.R. 79, 85 (1996); *Van Ee v. E.P.A.*, 64 M.S.P.R. 693, 698 (1994). In *Nafus*, 57 M.S.P.R. at 393, the Merit Systems Protections Board derived this definition largely from the plain language of the federal whistleblower statute, which protects an employee who makes a good-faith disclosure about "a *gross* waste of funds." 5 U.S.C. § 2302(b)(8)(A)(ii) (1988) (emphasis added) (current version at 5 U.S.C. § 2302(a)(2)(D)(ii)) (2018)). The Board relied on a dictionary that defined "gross" in part as " '[o]ut of all measure; beyond allowance; flagrant; shameful" and "[s]uch conduct as is not to be excused.' " *Nafus*, 57 M.S.P.R at 393 (first alteration in original) (quoting *Black's Law Dictionary* (6th ed. 1990)).

{31}   Because the adjective "gross" does not modify the phrase "waste of funds" in the WPA, we do not find *Nafus* and other federal precedent persuasive in determining the type of conduct New Mexico's whistleblower statute protects. Although we have observed generally that "[t]he WPA was modeled after its federal counterpart[,]" *Wills v. Bd. of Regents of Univ. of N.M.*, 2015-NMCA-105, ¶ 19, 357 P.3d 453, we have never concluded that the protections of the WPA are identical to those of the federal statute in every respect or that we will interpret the WPA in lockstep with federal precedent. A sound reason for departing from federal law is obvious here: When the Legislature enacted the WPA in 2010, it chose *not* to track the limiting language that Congress used. Instead, our WPA protects a communication if it pertains to "a waste of funds." Section 10-16C-2(E)(3). Based on this material difference between the plain language of the state and federal statutes, we decline to follow federal precedent interpreting the phrase "gross waste of funds." *See Whitely v. N.M. State Pers. Bd.*, 1993-NMSC-019, ¶ 5, 115 N.M. 308, 850 P.2d 1011 (recognizing that a court's task when interpreting a statute is to "determine and effectuate the intent of the [L]egislature," and that "the plain language of the statute [is] the primary indicator of legislative intent"). Because the federal test does not govern claims under New Mexico's WPA, we will not use that test to evaluate the evidence in the case before us.

{32}   Defendant also argues that to the extent that Plaintiff relied on her communications about lack of funding for kitchen staff, Plaintiff's theory "depends upon a chain of speculative causation," and that the WPA does not protect such "exhaustive conjecture." Plaintiff responds that the WPA protects communications about potential wastes of funds, including her communications to Defendant, which were not speculative.

{33}   Both parties rely on *Reid v. Merit Systems Protection Board*, 508 F.3d 674 (Fed. Cir. 2007). In *Reid*, the employee alleged that her supervisor had instructed her to take steps to justify the award of a sole-source contract, and that she communicated to the supervisor and others that such a contract would violate a federal regulation. *Id.* at 676. An administrative law judge concluded that these allegations were insufficient under the federal whistleblower statute because, among other reasons, the employee "could not

believe that the information she disclosed reasonably evidenced a violation of law, rule, or regulation because the course of action she complained of was never taken[.]" *Id.* But the Court of Appeals for the Federal Circuit rejected that conclusion and reversed. Adopting the reasoning of *Ward v. Department of Army*, 67 M.S.P.R. 482 (1995), the court explained that "requiring a violation of law, rule, or regulation to occur before the employee could make a protected disclosure would force the employee either to act without protection or to risk being partially responsible for the violation." *Reid*, 508 F.3d at 678; *see also Ward*, 67 M.S.P.R. at 488. The court recognized that "[t]he government is far better served by having the opportunity to prevent illegal, wasteful, and abusive conduct than by notice that it may only act to reduce the adverse consequences from such conduct that has already occurred." *Reid*, 508 F.3d at 678. With respect to potential violations of a law, rule, or regulation, the court explained that the test is whether there is "[a] reasonable belief that a violation . . . is imminent." *Id.* at 677. Stated differently, there must be a reasonable basis to believe that " 'potential wrongdoing [is] real and immediate.' " *Id.* at 678 (quoting *Ward*, 67 M.S.P.R. at 488-89). The court held that the employee had alleged "a reasonable belief of a potential violation." *Id.*

**{34}** Notwithstanding this, Defendant seizes on the court's statement that not every "mere thought, suggestion, or discussion of an action that someone might consider to be a violation of a law, rule, or regulation is a justification for a whistleblower complaint." *Id.* But the court in *Reid* qualified this statement, explaining that

> [d]iscussion among employees and supervisors concerning various possible courses of action is healthy and normal in any organization. It may in fact avoid a violation. When such discussion proceeds to an instruction to violate the law must depend on the facts of a given case. *But a holding that an instruction to carry out an act can never qualify under the WPA if the act never occurred is too bright a line. The determination depends on the facts.*

*Id.* (emphasis added).

**{35}** *Reid* would not support reversal here even if its analysis applied under the WPA. Viewing the evidence in the light most favorable to Plaintiff, her communications were based on a reasonable belief that a waste of funds was imminent. Plaintiff presented evidence that she warned Defendant that its refusal to approve the expenditures at issue would make it impossible to hold specific events at the El Rito campus, and that if those events were not held, the consequences would include a loss of revenue, including $42,000 in anticipated profit from the USFS youth camp contract, and the inability to use equipment purchased with grant money. Under *Reid*, an employee need not wait for the wasteful act or failure to act to occur, and the facts available to Plaintiff gave her a reasonable basis to believe that the potential for a waste of funds was real and immediate. The failure to use the equipment and loss of income were not speculative. Plaintiff established a sufficient nexus between Defendant rejecting the proposed expenditures and a potential waste of funds. Because there is a reasonable

basis in fact to believe that a waste of funds was imminent, we will not undo the jury's determination that Plaintiff acted in good faith. *See* § 10-16C-2(A).

### b.    Gross Mismanagement

**{36}**    The jury could also have reasonably concluded that Plaintiff's communications pertained to what Plaintiff believed in good faith was "gross mismanagement." The jury instructions defined "gross mismanagement" as "a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission." Based on the facts summarized above, the jury could have determined that Plaintiff had a good faith belief that Defendant's refusal to approve the expenditures posed a substantial risk of a significant adverse impact on Defendant's ability to accomplish its mission, which included revitalizing the El Rito campus by implementing the plan for the development of the Innovation Center. In a plan that the Board of Regents supported and that President Barcelo directed Plaintiff to implement, Plaintiff had identified strengthening the center's financial viability through development of revenue centers as an essential first step in successfully implementing the plan for the center, and the jury could have reasonably concluded that refusing to approve the purchase orders and fund the payment of kitchen staff for events jeopardized revenue streams significant to the center's financial viability.

**{37}**    Defendant argues that Plaintiff's communications pertained to Defendant's choices regarding the allocation of funds between competing priorities and differences of opinion about how to approach a problem, neither of which amounts to the kind of "severe wrongdoing" that must be involved for a disclosing employee to obtain the WPA's protection. Defendant presented these same defenses to the jury, which was instructed that the following do not amount to "gross mismanagement": (1) "[d]ifferences of opinion between an employee and [her] agency superiors as to the proper approach to a particular problem or the most appropriate course of action" and (2) "[t]he allocation of funds among several competing priorities within an agency[.]"[3] To the extent that the jury relied on the "gross mismanagement" theory in returning a verdict for Plaintiff, it must have rejected Defendant's arguments that the communications did not pertain to decisions that rose to the level of gross mismanagement. Substantial evidence supported that rejection. The jury could rationally have concluded that Plaintiff's communications involved a fact-based concern that her superiors' proposed actions on

---

[3]The instructions that define gross mismanagement in this case are based on precedent interpreting the federal whistleblower statute, *see White v. Dep't of Air Force*, 391 F.3d 1377, 1381 (Fed. Cir. 2004) ("Mere differences of opinion between an employee and his agency superiors as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement."); *Nafus*, 57 M.S.P.R. at 395 ("Gross mismanagement means a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission."), and precedent interpreting that precedent, *see Winder v. Erste*, 905 F. Supp. 2d 19, 36 (D.D.C. 2012) ("The allocation of funds among several competing priorities within an agency is a common problem, not a symptom of 'gross mismanagement.' " (quoting *White*, 391 F.3d at 1383)). Because this appeal does not present questions about whether the instructions are correct under the WPA, we offer no opinion on any such questions and instead measure the evidence against the given instructions. *Goodman v. OS Rest. Servs., LLC*, 2020-NMCA-019, ¶ 16, 461 P.3d 906, *cert. dismissed*, 2020-NMCERT-___ (No. S-1-SC-37873, Jan. 13, 2020).

a matter of importance within Defendant's operations were inconsistent with those any reasonable employer would have taken in similar conditions. There was evidence from which the jury could have found that grant funds and group visits were essential to the revitalization project, that Defendant had demonstrated a high-level commitment to the project, and that serious consequences would flow from a failure to make Plaintiff's requested expenditures. We hold that Plaintiff introduced sufficient evidence that her communications did not involve a mere difference of opinion or a dispute involving the allocation of funds among competing priorities.

{38}    Defendant points to evidence that it asserts required the jury to conclude that the communications did not pertain to gross mismanagement. But the question before us is whether that conclusion is the *only* reasonable one in light of *all* of the evidence, not just the evidence that supports Defendant's theory. *See Concerned Residents of Santa Fe. N. v. Santa Fe Estates, Inc.*, 2008-NMCA-042, ¶ 68, 143 N.M. 811, 182 P.3d 794 ("In reviewing a substantial evidence claim, the question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." (alteration, internal quotation marks, and citation omitted)). It was not. As we have explained, the evidence that Plaintiff presented supported a reasonable conclusion that her communications pertained to a good-faith belief about gross mismanagement by Defendant. Under our deferential standard of review, it does not matter that a reasonable jury could have reached the opposite conclusion by interpreting the evidence in a manner more favorable to Defendant.

{39}    We hold that the evidence sufficed to prove that Plaintiff engaged in conduct that the WPA protects.

## 2.    Retaliation

{40}    Substantial evidence also supported the jury's finding that when Defendant removed Plaintiff from her position as Director of the El Rito campus and, later, when it terminated her employment, Defendant did so in retaliation for Plaintiff's protected conduct. The district court instructed the jury that Plaintiff had the burden of proving that Defendant "engaged in a retaliatory action against [P]laintiff" and that Defendant "engaged in the retaliatory action against [P]laintiff because of the communication about the unlawful or improper act." "Retaliatory action" was defined, in accordance with Section 10-16C-2(D), as "any discriminatory or adverse employment action against a public employee in the terms and conditions of public employment." The instructions informed the jury that Plaintiff could "prove retaliation through indirect evidence, . . . [i.e.] circumstantial evidence, showing that [D]efendant's explanations for its conduct are unworthy of belief and merely a pretext for retaliation" and that the jury was "entitled to infer retaliation if [it] disbelieve[d D]efendant[']s explanations for its actions." This instruction is consistent with our Supreme Court's recognition that "[i]t is rare a defendant keeps documents or makes statements that directly indicate a retaliatory motive for terminating an employee"; that "whether a proffered justification is legitimate, or is merely an excuse to cover up illegal conduct, is largely a credibility issue and often requires the use of circumstantial evidence"; and that "[i]ssues such as this should

normally be left exclusively to the province of the jury." *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 23, 139 N.M. 12, 127 P.3d 548. *See generally id.* ¶¶ 23-27 (reversing the district court's grant of summary judgment on a retaliation claim brought under the New Mexico Human Rights Act (NMHRA) because there was a disputed issue of material fact on the issue of whether a proffered justification for allegedly retaliatory action was pretextual).

**{41}** Plaintiff presented circumstantial evidence from which the jury could reasonably infer that Defendant's innocent explanations for removing Plaintiff from her position and then terminating her employment were pretexts designed to disguise retaliatory motives. At trial, Plaintiff and Defendant presented competing theories to explain the reasons for Defendant's removal and termination of Plaintiff. Plaintiff invited the jury to infer retaliation from a combination of circumstances, including that Defendant removed her from the campus director position just a few weeks after she communicated her concerns to Defendant's administrators. Temporal proximity between protected conduct and adverse employment action is one factor that may support an inference of retaliatory motive. *See id.* ¶ 22 ("The fact-finder should be free to consider timing and proximity, along with all the other facts and circumstances, in deciding the ultimate issue of causation.").

**{42}** The evidence about Plaintiff's performance evaluations also supported an inference that a retaliatory motive drove Defendant's decisions with respect to Plaintiff's employment. It was undisputed that Dr. Sena gave her a positive performance evaluation before she communicated her concerns but gave her two negative evaluations after her communications. Dr. Sena's pre-communication average score was 4.4 out of 5, but his post-communication averages were 1.4 and 2.2. Based on this abrupt and dramatic change and Plaintiff's testimony that the post-communication evaluations did not accurately reflect the quality of her work, the jury could have reasonably concluded that the post-communication evaluations were pretext designed to conceal retaliatory conduct, rather than genuine evaluations scored fairly based on Plaintiff's actual job performance. Although Dr. Sena testified that Plaintiff's performance "turned on a dime," the jury was not required to accept his testimony as the truth. And, under the jury instructions, a determination that Dr. Sena's explanation was "unworthy of belief" was sufficient to support an inference that Defendant was retaliating against Plaintiff when it gave her negative evaluations, reprimanded her, removed her from her position as campus director and transferred her to a different position. The jury could also have reasonably inferred that Dr. Sena, acting on behalf of Defendant, transferred Plaintiff to the position of Director of Continuing Education because he knew that that position, having been eliminated just months before Plaintiff's transfer, would be eliminated again at the end of the fiscal year.

**{43}** Such inferences would also have allowed the jury to reject Defendant's affirmative defense that it had legitimate business reasons for reprimanding and reassigning Plaintiff and, later, for not renewing her employment contract for the 2014-15 fiscal year. *See* § 10-16C-4(B) ("It shall be an affirmative defense . . . that the action taken by a public employer against a public employee was due to the employee's

misconduct, the employee's poor job performance, a reduction in work force or other legitimate business purpose unrelated to conduct prohibited pursuant to the [WPA] and that retaliatory action was not a motivating factor."). Defendant bore the burden of proving that retaliation was "not a motivating factor," *id.*—that, if Plaintiff had not engaged in protected conduct, Defendant would have reprimanded her, removed her from her director position, and terminated her nonetheless. *See Strausberg v. Laurel Healthcare Providers, LLC*, 2013-NMSC-032, ¶ 3, 304 P.3d 409 ("[U]nder settled principles of New Mexico law, the party asserting an affirmative defense has the burden of proof."). Without being unreasonable, the jury could have determined that Defendant failed to carry that burden because its stated justifications for its decisions were not worthy of belief or because mixed motives, including a forbidden retaliatory one, factored into its decision-making.

**{44}** Sufficient evidence supported the jury's finding that retaliation was at least one of the factors that motivated Defendant when it removed Plaintiff from her position as Director of the El Rito campus and later when it declined to renew her annual employment contract.

## II. New Trial

**{45}** Defendant contends that the district court erred by denying Defendant's motion for a new trial, the premise of which was that the testimony of one of Plaintiff's witnesses was highly prejudicial. Under Rule 1-059 NMRA, "[t]he district court has broad discretion in granting or denying a motion for new trial, and such an order will not be reversed absent clear and manifest abuse of that discretion."[4] *Estate of Saenz ex rel. Saenz v. Ranack Constructors, Inc.*, 2018-NMSC-032, ¶ 19, 420 P.3d 576 (internal quotation marks and citation omitted). Applying this deferential standard, we see no basis for reversal.

**{46}** Defendant's new trial motion pertained to the testimony of Dr. Carmen Melendres, who began working for Defendant as a grant writer while Plaintiff was directing the El Rito campus. The thrust of Defendant's argument is that Dr. Melendres gave inadmissible and inflammatory testimony.[5] This testimony falls into two categories:

---

[4]Plaintiff argues that Defendant failed to preserve this issue because it did not move for a mistrial. We assume without deciding that Defendant's multiple objections to the admission of the testimony at issue preserved the issue.

[5]In addition to arguing that the testimony was substantively prejudicial, Defendant asserts that the admission of the testimony involved procedural prejudice because the testimony strayed beyond the scope of the summary of anticipated testimony that Plaintiff provided as part of her pretrial disclosures. Defendant relies on the proposition that discovery is designed to avoid surprise at trial and asserts that Defendant was not able to effectively cross-examine Dr. Melendres because the subject matter of her testimony was not fully disclosed. However, Defendant does not cite any cases in which an abuse of discretion in denying a new trial has been found based on a similar theory. Nor does Defendant explain why it could not have availed itself of any additional discovery devices, such as a deposition of Dr. Melendres, to gain more information about what testimony she might give. And Defendant does not explain how any effective cross-examination enabled by a fuller pretrial disclosure would have had any impact on the outcome at trial. *See generally Valerio v. San Mateo Enters., Inc.*, 2017-NMCA-059, ¶ 16, 400 P.3d 275 ("[W]e will not set aside a judgment based on mere speculation that [an] error influenced

(1) testimony pertaining to $50,000 in Title V grant funds that, according to Dr. Melendres, Defendant retained even though they were not used for their intended purpose of completing laboratories at the El Rito campus; and (2) testimony that Dr. Melendres stepped down as director of the grant after discussing Defendant's handling of the grant funds with a federal program officer, who advised her that she "did not want to be responsible for what was potentially going to happen" as a result of Defendant's handling of the money.

{47}    The district court granted Defendant's motion to strike the testimony in the second category and promptly and clearly instructed the jury not to consider it, and we presume that the jury did as it was told. *Vigil v. Miners Colfax Med. Ctr.*, 1994-NMCA-054, ¶ 22, 117 N.M. 665, 875 P.2d 1096. Under these circumstances, the general rule is that a "prompt admonition" to "disregard and not consider inadmissible evidence sufficiently cures any prejudicial effect which might otherwise result." *State v. Hernandez*, 2017-NMCA-020, ¶ 17, 388 P.3d 1016 (internal quotation marks and citation omitted); *see Apodaca v. Miller*, 1968-NMSC-086, ¶ 21, 79 N.M. 160, 441 P.2d 200 ("[U]nless it is clear that prejudice resulted because of evidence erroneously admitted, striking or instructing the jury to disregard it will cure the error and avoid reversal."). Defendant relies on an exception applicable in criminal cases: When a lawyer intentionally elicits inadmissible evidence, we do not presume the absence of prejudice. *Hernandez*, 2017-NMCA-020, ¶ 17. Defendant argues that counsel for Plaintiff acted intentionally, but counsel stated unequivocally under oath that he did not, and Defendant has neither cited evidence nor offered argument raising any doubt about counsel's credibility, the assessment of which was a task for the district court anyhow.[6] *See Reed v. Furr's Supermarkets, Inc.*, 2000-NMCA-091, ¶ 23, 129 N.M. 639, 11 P.3d 603 (discussing the fact-finding role of the district court in a motion hearing). The general rule governs here. Because the curative instruction effectively nullified any prejudice, the testimony in the second category did not require a new trial.

{48}    Nor did the testimony in the first, though for different reasons. That testimony was admitted, and it was potentially prejudicial because it implied that Defendant engaged in misappropriation of public funds, which is arguably more inflammatory than wasting public funds or engaging in gross mismanagement. However, we must assess the possible prejudice in the context of the entire trial, deferring to the district court judge, who observed all of the testimony as well as the jury's reactions to that testimony. *See generally Rhein v. ADT Auto., Inc.*, 1996-NMSC-066, ¶ 18, 122 N.M.

---

the outcome of the case." (internal quotation marks and citation omitted)). Because Defendant has failed to develop this argument, we do not consider it on the merits. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not review unclear arguments, or guess at what a party's arguments might be." (alteration, internal quotation marks, and citation omitted)).

6Defendant argues in the alternative that if counsel for Plaintiff did not act intentionally, Dr. Melendres must have done so because she came to the stand with "an axe to grind," and that this Court should treat prejudicial testimony deliberately given by a witness the same way we treat such testimony deliberately elicited by a lawyer. Because Defendant cites no precedent to support such an approach, we assume none exists. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329. Moreover, Defendant provides no rationale for extending the exception to witnesses, and we can identify no persuasive justification for doing so.

646, 930 P.2d 783 ("We apply [an] abuse-of-discretion standard because the trial judge has observed the demeanor of the witnesses and has heard all the evidence[,] and thus the function of passing on motions for new trial belongs naturally and peculiarly to the trial court." (alterations, omission, internal quotation marks, and citation omitted)). The testimony at issue was a brief part of a four-day trial that featured the testimony of Plaintiff, President Barcelo, Dr. Sena, Mr. Sanchez, and Dr. Biggs—the witnesses who had first-hand knowledge of the facts most pertinent to liability and damages. And the parties' closing arguments focused on the testimony of those witnesses. Plaintiff's counsel did not highlight, or even mention, the specific testimony at issue during his closing arguments.

**{49}** Considering all of the circumstances, we are not persuaded that the district court abused its discretion by denying Defendant's motion for a new trial.

## III. Reinstatement

**{50}** Defendant contends that the district court erred by ordering Defendant to reinstate Plaintiff pursuant to Section 10-16C-4(A). We disagree.

**{51}** Because reinstatement is an equitable remedy, *see Collado v. City of Albuquerque*, 2002-NMCA-048, ¶¶ 22-24, 132 N.M. 133, 45 P.3d 73, our standard of review is abuse of discretion. *State ex rel. King v. B&B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 28, 329 P.3d 658. "An abuse of discretion will be found when the trial court's decision is clearly untenable or contrary to logic and reason." *Id.* (internal quotation marks and citation omitted).

**{52}** The WPA provides for reinstatement in Section 10-16C-4(A), which states, in pertinent part, that "[a] public employer that violates the provisions of the [WPA] shall be liable to the public employee for . . . reinstatement with the same seniority status that the employee would have had but for the violation[.]" As the statute's plain language indicates, one purpose of reinstatement is to make the employee whole by putting her in the position she would have been in had her employer not retaliated. *Cf. Collado*, 2002-NMCA-048, ¶ 22 (noting, in a breach of employment contract case, that it is unexceptional to conclude that "equitable relief is the most appropriate way to make an employee whole" and identifying reinstatement as a type of equitable relief). The same purpose underlies the remedy of reinstatement provided for by federal statutes that protect employees from unlawful retaliation and discrimination.[7] *See, e.g., Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (recognizing that a central purpose of Title VII is to make victims of employment discrimination whole and that Congress "effectuate[d] this 'make whole' objective" in part by authorizing the remedy of reinstatement); *Kerr v. Nat'l Endowment for the Arts*, 726 F.2d 730, 733 (Fed. Cir. 1984) (recognizing that the basic purpose of reinstatement "is restoration of the situation, as nearly as possible, to that which would have obtained but for" the employer's unlawful

---

[7]Although federal precedent is not controlling with respect to either the interpretation of the WPA or the remedial powers of New Mexico courts, we find that the cited federal precedent accurately describes the purposes of the reinstatement remedy contemplated by the WPA.

action (internal quotation marks and citation omitted)). "[R]einstatement offers the most likely means of making a plaintiff whole by allowing her to continue her career as if the [employer's unlawful action] had not occurred." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1338 (11th Cir. 1999). When a person loses his or her job, money damages alone will not make the person whole because, although "[t]he psychological benefits of work are intangible, . . . they are real and cannot be ignored." *Id.* (internal quotation marks and citation omitted); *see Jackson v. City of Albuquerque*, 890 F.2d 225, 233-34 (10th Cir. 1989) (recognizing that reinstatement should ordinarily be granted in wrongful discharge cases brought under 42 U.S.C. § 1983 (1988), in part because when a person loses a job, money damages are insufficient to make the person whole).

**{53}** Reinstatement also deters violations of the WPA, just as it deters violations of other statutes that forbid discrimination and retaliation. *See Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 230 (2d Cir. 2006) ("Under Title VII, the best choice is to reinstate the plaintiff, because this accomplishes the dual goals of providing make-whole relief for a prevailing plaintiff and deterring future unlawful conduct."); *Squires v. Bonser*, 54 F.3d 168, 172-73 (3d Cir. 1995) (recognizing, in the context of 42 U.S.C. § 1983, that "[r]einstatement advances the policy goals of make-whole relief and deterrence in a way which money damages cannot"). The deterrence rationale is simple: "If an employer's best efforts to remove an employee for [unlawful] reasons are presumptively unlikely to succeed, there is . . . less incentive to use employment decisions to chill the exercise of [legal] rights." *Allen v. Autauga Cty. Bd. of Educ.*, 685 F.2d 1302, 1306 (11th Cir. 1982); *accord Reiter*, 457 F.3d at 230; *Hiraldo-Cancel v. Aponte*, 925 F.2d 10, 13 (1st Cir. 1991); *Jackson*, 890 F.2d at 235.

**{54}** Mindful of these goals, we turn to Defendant's arguments. Although Section 10-16C-4(A) states that public employers "shall be liable" for reinstatement and does not explicitly identify any exceptions to this apparent mandate, Defendant argues, based on federal precedent, that reinstatement is not appropriate under the facts of this case. However, in the cases Defendant relies on, the courts did not apply statutes that use mandatory language in connection with reinstatement. Even assuming without deciding that the WPA grants courts the discretion to deny reinstatement for the reasons the federal courts have identified, none of those reasons compelled the district court to deny reinstatement here.

**{55}** This Court has recognized, consistent with federal precedent, that "[t]he overarching preference in employment discrimination cases is for reinstatement." *Maestas v. Town of Taos*, 2020-NMCA-027, ¶ 12, 464 P.3d 1056 (internal quotation marks and citation omitted), *cert. granted*, 2020-NMCERT-___ (No. S-1-SC-38171, Apr. 27, 2020); *see also Starrett v. Wadley*, 876 F.2d 808, 824 (10th Cir. 1989) ("[R]einstatement usually will be granted when a plaintiff prevails in a wrongful discharge case brought under Section 1983."); *Reeves v. Claiborne Cty. Bd. of Educ.*, 828 F.2d 1096, 1101 (5th Cir. 1987) (recognizing that "[r]einstatement is . . . normally an integral part of the remedy for a[n] . . . impermissible employment action"); *Allen*, 685 F.2d at 1305 ("[R]einstatement is a basic element of the appropriate remedy in wrongful employee discharge cases and, except in extraordinary cases, is required."). Although a

plaintiff does not have an absolute right to reinstatement, "once the plaintiff establishes that his [or her] discharge resulted from [unlawful] motives, he [or she] is presumed to be entitled to reinstatement." *Reeves*, 828 F.2d at 1101 (emphasis, internal quotation marks, and citation omitted). "[A] denial of reinstatement is unwarranted unless grounded in a rationale which is harmonious with the legislative goals of providing [the] plaintiff[] make-whole relief and deterring [the] employer[] from [unlawful] conduct." *Squires*, 54 F.3d at 172. Defendant has not persuaded us that any such rationale mandated denial of reinstatement here.

{56}    The first of Defendant's four arguments is that "[t]he evidence did not support [reinstatement] due to the unduly speculative nature of prospective one-year contract offers." Even if we give Defendant the benefit of the doubt and assume that an employee must prove, not just that an employer has unlawfully terminated her in violation of the WPA, but also that she would have continued to be employed until the time of trial, that does not aid Defendant. On the record before us, we cannot conclude that the district court's decision to order reinstatement was "untenable or contrary to logic and reason" even if the assumption were correct. *B&B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 28 (internal quotation marks and citation omitted). The jury implicitly determined that Plaintiff would have remained employed until the time of trial in awarding her back pay equivalent to the pay she would have received from the time of her termination until then. There was evidence that, before the reprisal began, Plaintiff had been employed for multiple years pursuant to annual employment contracts, had consistently received positive reviews, had been described by President Barcelo as "a rising star," had recently earned a promotion to campus director, and had Defendant's support for implementing a multi-year campus revitalization project. The district court did not err, if the inquiry was even necessary, in determining, on the basis of the same evidence available to the jury, that Plaintiff would have remained employed as campus director going forward if Defendant had not knocked her career off course by retaliating against her.

{57}    Defendant's next rationale springs from *E.E.O.C. v. Prudential Federal Savings & Loan Ass'n*, 763 F.2d 1166, 1172 (10th Cir. 1985), in which the Tenth Circuit stated that "[r]einstatement may not be appropriate . . . when the employer has exhibited such *extreme* hostility that, as a practical matter, a productive and amicable working relationship would be impossible."[8] (Emphasis added.) Defendant relies on a snippet of

---

[8]The Tenth Circuit explained that when reinstatement is not possible, "an award of future damages in lieu of reinstatement" will "assur[e] that the aggrieved party is returned as nearly as possible to the economic situation he would have enjoyed but for the defendant's illegal conduct[,]" and that "[i]f this were not the case, an employer could avoid the purpose of [an anti-discrimination law] simply by making reinstatement so unattractive and infeasible that the wronged employee would not want to return." *Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d at 1173; *see also Shore v. Fed. Express Corp.*, 777 F.2d 1155, 1159 (6th Cir. 1985) (explaining that if "reinstatement is not possible, an award of front pay is sometimes appropriate" and that such awards "should be evaluated under the standards applied to all Title VII relief: whether the award will aid in ending illegal discrimination and rectifying the harm it causes"). However, Defendant asserts that front pay is not available under the WPA. Section 10-16C-4(A) does not authorize awards of front pay, but Section 10-16C-4(C) states that "[t]he remedies provided for in the [WPA] are not exclusive and shall be in addition to any other remedies provided for in any other law or available under common law." Because the district court ordered Defendant to reinstate Plaintiff, it did not address her alternative

Plaintiff's testimony about why she did not obtain a job with Defendant after it terminated her. Plaintiff testified that one of Defendant's vice presidents had told another employee "that the only reason [Defendant] would hire me was because I was suing the college." When asked what effect that information had on her, Plaintiff testified, "I felt that I would have stepped in a position of hostility, if I would have taken any of those positions." She then described other factors that played a role in her not being employed in one of those positions. One position involved a salary $40,000 lower than her director salary, and Defendant told her she was not qualified for the other position. Although this testimony indicated that Plaintiff perceived some hostility, it did not require the district court judge to conclude that the hostility was so "extreme" that it would be practically "impossible" for Plaintiff and Defendant to work together amicably and productively. *Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d at 1172; *see also Farley*, 197 F.3d at 1339 (emphasizing that "the presence of some hostility between parties . . . should not normally preclude a plaintiff from receiving reinstatement"). Under these circumstances, reversing the reinstatement order because of Defendant's hostility toward Plaintiff would be inharmonious with the legislative goal of deterring unlawful conduct. *See Squires*, 54 F.3d at 172. To the extent that certain employees of Defendant wanted the college to end its relationship with Plaintiff permanently, denying reinstatement based on their hostility toward Plaintiff would help them achieve that goal, thereby encouraging rather than discouraging retaliation against whistleblowers. *See Farley*, 197 F.3d at 1339-40 ("Defendants found liable of intentional discrimination may not profit from their conduct by preventing former employees unlawfully terminated from returning to work on the grounds that there is hostility between the parties. To deny reinstatement on these grounds is to assist a defendant in obtaining his discriminatory goals." (citations omitted)); *Jackson*, 890 F.2d at 235 (reversing the denial of reinstatement in part because affirmance would accomplish the defendants' purpose of "run[ning the] plaintiff . . . off the job").

{58}   Defendant further argues that Plaintiff "did not meet her burden to show that reinstatement was feasible" because Defendant has not "extended equivalent offers for the El Rito or Continuing Education positions since 2014[,]" and Plaintiff "presented no evidence of any comparable openings that she was qualified to hold." This argument cannot be squared with the plain language of the WPA, which does not indicate that a plaintiff seeking reinstatement carries any burden in addition to the burden of persuading the jury that the defendant engaged in unlawful retaliation. *See* § 10-16C-4(A) ("A public employer that violates the provisions of the [WPA] shall be liable to the public employee for . . . reinstatement with the same seniority status that the employee would have had but for the violation[.]"). Nor can Defendant's argument be squared with federal precedent, under which reinstatement is the rule and denial of reinstatement (accompanied, perhaps, by an award of front pay, as noted above) is the exception. *See Starrett*, 876 F.2d at 824; *Reeves*, 828 F.2d at 1101; *Allen*, 685 F.2d at 1305. Although reinstatement may place incidental burdens on Defendant, such burdens are foreseeable consequences of Defendant's unlawful conduct, and Defendant has not established that those burdens mandated the denial of reinstatement here. *See*

request for front pay. Reversal of the reinstatement order would revive that request. Affirmance makes it unnecessary for us to resolve issues pertaining to front pay.

*Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 322 (1st Cir. 1989) (explaining that "in the real world, reinstatement in unlawful-discharge cases often will place some burden on the [employer,]" which might include displacement of "employees who have assumed duties previously performed by the fired worker" and that such burdens are "usually insufficient, without more, to tip the scales against reinstatement when first amendment rights are at stake in a [S]ection 1983 action"); *Sterzing v. Fort Bend Indep. Sch. Dist.*, 496 F.2d 92, 93 (5th Cir. 1974) (per curiam) (recognizing, in the context of an employee's request for reinstatement based on a violation of constitutional rights, that the enforcement of those rights "frequently has disturbing consequences" and that "[r]elief is not restricted to that which will be pleasing and free of irritation"); *Banks v. Burkich*, 788 F.2d 1161, 1165 (6th Cir. 1986) (same); *cf. Martinez v. Cities of Gold Casino*, 2009-NMCA-087, ¶ 31, 146 N.M. 735, 215 P.3d 44 (directing the employer in a worker's compensation case to provide a worker "with a position of employment . . . substantially equivalent to the position [the worker] formerly held in terms of pay and benefits" where the worker's mandatory license had been suspended and the worker's compensation judge believed that it lacked authority to order reissuance of the license).

**{59}**     Defendant's final argument is that reinstatement is not appropriate because Plaintiff failed to mitigate her damages by "pursu[ing] two open positions at the [c]ollege" after the retaliation occurred. We find it unnecessary, in resolving this appeal, to address the dubious proposition that a failure to mitigate damages by seeking alternative employment precludes the equitable remedy of reinstatement. *But cf. Dilley v. SuperValu, Inc.*, 296 F.3d 958, 967 (10th Cir. 2002) ("A plaintiff's ability to replace some of the income lost by virtue of [a] wrongful discharge certainly affects how much lost income [the plaintiff] is due, but it does not bear on whether the plaintiff is entitled to the job itself."). Defendant cites no authority supporting that proposition, *see generally In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, and fails to articulate any rationale for "link[ing] a plaintiff's pursuit of alternative employment" to whether the plaintiff "should be reinstated to the position from which [the plaintiff] was wrongfully discharged." *Dilley*, 296 F.3d at 967-68. We decline to address this undeveloped argument. *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076.

**{60}**     We hold that the district court did not err by ordering reinstatement.

## IV.     Back Pay for Retaliatory Refusal to Renew Employment Contract

**{61}**     Defendant argues that the WPA does not authorize an award of back pay to compensate Plaintiff for income that she would have received had Defendant renewed her employment contract. *See* § 10-16C-4(A) (providing that an employer who violates the WPA "shall be liable" to the employee for, among other things, "two times the amount of back pay with interest on the back pay"). This argument raises a question of statutory interpretation, which we review de novo. *Cates*, 2017-NMCA-063, ¶ 14. Although the WPA expressly provides for back pay, and our interpretation must begin with the statute's plain language, *State v. Suazo*, 2017-NMSC-011, ¶ 16, 390 P.3d 674, Defendant does not identify any language in the WPA that supports its argument, and

we conclude that the pertinent language authorizes an award when, as the jury found in this case, an employer retaliates by refusing to renew an employee's contract.

**{62}**    Our analysis begins with the WPA's fundamental command: "A public employer shall not take any retaliatory action against a public employee because the public employee" engages in protected conduct. Section 10-16C-3. The statute defines "public employee" as "a person who works for or contracts with a public employer." Section 10-16C-2(B). Contract employees fall within the plain language of that definition, which includes all employees. Nothing in the WPA suggests that whether the employment relationship is contractual has any bearing on the statute's application, and we will not add such language to the statute. *See Janet v. Marshall*, 2013-NMCA-037, ¶ 23, 296 P.3d 1253. Based on the inclusion of contract employees in the definition of "public employee" and the absence of language elsewhere in the WPA that differentiates between contract employees and at-will employees, we conclude that our Legislature intended for contract employees to enjoy the same protection against retaliatory action that at-will employees enjoy.

**{63}**    Our next task is to determine whether nonrenewal of an employment contract constitutes "retaliatory action," which the WPA defines as "*any* discriminatory or adverse employment action against a public employee in the terms and conditions of public employment." Section 10-16C-2(D) (emphasis added). This broad definition encompasses the termination of public employment. Indeed, no action with respect to the terms and conditions of employment could be more adverse than termination. And termination is the lens through which we view retaliatory contract nonrenewal. Whether something qualifies as an adverse employment action must be determined in reference to an employee's "terms and conditions of employment"—to the employment relationship that in fact existed between employer and employee. The essence of a retaliatory nonrenewal claim is that retaliation caused the end of that relationship—that the nonrenewal reflects, not mere passivity, but a conscious effort to end employment that would have continued under circumstances in which the employee had not engaged in whistleblowing. We conclude that a public employer who refuses to renew a public employee's contract because of the employee's protected conduct has taken an "adverse employment action . . . in the terms and conditions of public employment" within the meaning of the WPA. Section 10-16C-2(D). The WPA does not distinguish between the various methods that an employer might use to achieve its retaliatory goal of putting an end to a person's employment.

**{64}**    In sum, contract employees are "public employees" under the WPA, and employers may not refuse to renew a contract employee's contract because the employee made a protected communication. Terminating an employment relationship in retaliation for protected conduct violates the WPA and exposes the employer to liability for back pay; no exception excuses such reprisal merely because the victim is employed pursuant to a contract or because the method of termination is nonrenewal. We hold that the WPA authorizes awards of back pay to public employees who lose their jobs when their employers retaliate against them by refusing to renew their contracts.

**{65}**    Our holding is necessary to achieve the goals of the WPA: to encourage employees to engage in whistleblowing and other protected activity and, when they do so, to discourage employers from retaliating. *See San Juan Agric. Water Users Ass'n v. KNME-TV*, 2011-NMSC-011, ¶ 14, 150 N.M. 64, 257 P.3d 884 ("A statute should be interpreted . . . to accomplish the ends sought to be accomplished by it." (internal quotation marks and citation omitted)). To somehow place contract nonrenewal beyond the reach of the statute would discourage contract employees from engaging in protected activity and limit the disclosure of information that would remain unexposed without whistleblowing by contract employees. Under Defendant's proposed holding, an employee seeking the renewal of her employment contract would have a powerful disincentive to refrain from, for example, making good-faith reports of unlawful or improper acts—including reports made possible only through her position as a contract employee. And a contract employee who loses her job through retaliatory nonrenewal would have no remedy for lost income under the WPA. Reading the WPA to exclude back pay for contract nonrenewal would allow employers to circumvent the statute, enabling them to retaliate against whistleblowers with impunity as long as the reprisal takes the form of contract nonrenewal. Permitting that circumvention would undermine the WPA's goal of encouraging whistleblowing by public employees.

**{66}**    A hypothetical illustrates the potential for mischief and injustice. One month before her one-year renewable contract expires, an employee who has had annual contracts for the past ten years reports that her employer is embezzling public funds. Then her employer, aiming for payback but wishing to avoid liability, refuses to renew her contract rather than terminating her current contract effective immediately. Under the holding Defendant requests, the employer could easily sidestep the WPA, escaping liability for back pay, and the employee, who would have remained employed save for the whistleblowing, would be left without compensation for her lost income under a statute designed in part to compensate whistleblowers. We decline to interpret the WPA in a manner that would produce such absurd and unjust results. *Pucci Distrib. Co. v. Stephens*, 1987-NMSC-075, ¶ 12, 106 N.M. 228, 741 P.2d 831 ("We will not adopt a construction that makes [a] statute's application absurd, unreasonable or unjust.").

**{67}**    In support of its argument, Defendant relies not on the language of our WPA but instead on one out-of-jurisdiction case, *Wurtz v. Beecher Metropolitan. District*, 848 N.W.2d 121 (Mich. 2014), which we find unpersuasive. There, the Supreme Court of Michigan held that that state's whistleblower statute "does not apply to decisions regarding contract renewal," *id.* at 128, because the court "discern[ed] no legal difference between a contract employee seeking a new term of employment and a new applicant," *id.* at 129, and the statute, "by its express language, only applie[d] to current employees." *Id.* at 122. But the result and reasoning of *Wurtz* cannot be reconciled with the plain language and purposes of New Mexico's whistleblower statute. Under the WPA, all people who "work[] for or contract[] with" public employers are public employees, § 10-16C-2(B), and public employers are prohibited from "tak[ing] any retaliatory action against" them in the first place. Section 10-16C-3. A public employer who retaliates against a contract employee by refusing to renew the employee's contract defies that express prohibition.

**{68}** Nothing in our WPA supports equating people who have an existing employment relationship with a public employer—"public employees[,]" as defined in Section 10-16C-2(B)—with people who do not but are seeking to establish one—*prospective* public employees.[9] Our WPA treats contract employees and at-will employees identically, as we have explained. New Mexico's statute protects all people who obtain public employee status, as Plaintiff did, giving them the security to engage in protected conduct without fear of losing their jobs and providing for remedies, including back pay, when an employer illegally retaliates against them by severing the employer-employee relationship. Had the Legislature intended to dilute protection for contract employees, affording them less protection from retaliatory termination than other public employees, it could easily have said so somewhere in the WPA, but it did not. Without textual support, we will not undermine the WPA's ban on "any retaliatory action," § 10-16C-3, by turning the most adverse employment action that exists into the weapon of choice for employers intent on retaliating against whistleblowing contract employees.

## V.    Remittitur

**{69}** In her cross-appeal, Plaintiff challenges the district court's remittitur order, which reduced the jury's back pay award from $239,451 to $84,513 and its emotional distress award of $180,000 to $90,000. Because we are not persuaded that the jury's awards were so grossly out of proportion to the harms Plaintiff suffered as to shock the conscience, we reverse.

**{70}** "[T]o arrive at a reasonable award of damages," the jury and the district court judge should "work together, each diligently performing its respective duty[.]" *Sandoval v. Chrysler Corp.*, 1998-NMCA-085, ¶ 16, 125 N.M. 292, 960 P.2d 834. However, determining damages "is a fundamental function of a jury[,]" *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999-NMSC-006, ¶ 16, 127 N.M. 1, 976 P.2d 1 (internal quotation marks and citation omitted), which has "wide latitude" to determine what amount is appropriate. *Martinez v. Ponderosa Prods., Inc.*, 1988-NMCA-115, ¶ 6, 108 N.M. 385, 772 P.2d 1308; *accord Mathis v. Atchison, Topeka & Santa Fe Ry. Co.*, 1956-NMSC-074, ¶ 8, 61 N.M. 330, 300 P.2d 482. With respect to damages findings, our Supreme Court has emphasized that the district judge "has *limited* superintendence." *Nava v. City of Santa Fe*, 2004-NMSC-039, ¶ 16, 136 N.M. 647, 103 P.3d 571 (internal quotation marks and citation omitted). The judge owes significant deference to the jury, whose "verdict is presumed to be correct[,]" *Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 16, and whose findings with respect to the appropriate amount of damages "will not be disturbed as excessive except in extreme cases[.]" *Vivian v.*

---

9In equating contract employees to prospective employees, the Michigan Supreme Court found it relevant that a contract employee "has absolutely no claim to continued employment after his or her contract expires." *Wurtz*, 848 N.W.2d at 125 n.10 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 578 (1972)). We do not think that that proposition of law has any bearing on the present case. Because the plain language of the WPA bars a public employer from taking "any retaliatory action against[,]" § 10-16C-3, "a person who works for or contracts with" the employer, § 10-16C-2(B), we find it unnecessary to look beyond that language to determine whether an exception permits employers to take a particular kind of retaliatory action against public employees who have no right to enter into a new contract after their contract expires.

*Atchison, Topeka & Santa Fe Ry. Co.*, 1961-NMSC-093, ¶ 10, 69 N.M. 6, 363 P.2d 620; *accord Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 16. Accordingly, "the mere fact that a jury's award is possibly larger than the court would have given is not sufficient to disturb a verdict." *Hall v. Stiles*, 1953-NMSC-041, ¶ 9, 57 N.M. 281, 258 P.2d 386; *accord Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 16. The trial judge may only substitute the judge's damages determination for the jury's if "it appears that the amount awarded is so grossly out of proportion to the injury received as to shock the conscience." *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 20, 146 N.M. 853, 215 P.3d 791 (internal quotation marks and citation omitted).

**{71}**   New Mexico's "analytical framework for reviewing the grant of a remittitur[,]" *Nava*, 2004-NMSC-039, ¶ 16, respects the primacy of juries in determining damages. When a judge exercises the limited authority to override a jury's determination, the judge must provide "a clear articulation of how and why damages are excessive." *Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 17. Specifically, the order of remittitur "must be supported by express reasons" establishing that the jury acted based on "passion, prejudice, partiality, sympathy, undue influence or some corrupt cause or motive[,]" *Nava*, 2004-NMSC-039, ¶ 16 (internal quotation marks and citation omitted), or that "the jury has mistaken the measure of damages."[10] *Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 16 (internal quotation marks and citation omitted).[11] If the judge "sets forth certain reasons for which the appellant asserts there is a lack of

---

10The parties disagree about (1) whether the absence of a "clear articulation of how and why damages are excessive," *Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 17, suffices, standing alone, to warrant reversal; (2) whether the appropriate remedy for such error is reversal with instructions to amend the judgment consistent with the jury's verdict or reversal for a further explanation of the judge's reasons; (3) whether the explanation in this case was sufficiently clear and specific; and (4) whether Plaintiff was required to preserve this claim of error and if so, whether she preserved it. Because we reverse on other grounds, we do not address these questions.

11We analyze the remittitur granted in this case by applying the standard our Supreme Court approved of in *Allsup's* and *Nava*. This Court has indicated—as had our Supreme Court prior to *Allsup's*—that New Mexico law recognizes two tests for determining whether an award is shockingly excessive. *E.g.*, *Chavez v. Atchison, Topeka & Santa Fe Ry. Co.*, 1967-NMSC-012, ¶ 13, 77 N.M. 346, 423 P.2d 34. *Compare Sandoval v. Chrysler Corp.*, 1998-NMCA-085, ¶ 9, 125 N.M. 292, 960 P.2d 834 ("New Mexico case law provides two tests for determining whether an award is so excessive that it shocks the conscience: (1) whether the evidence, viewed in the light most favorable to plaintiff, substantially supports the award; and (2) whether there is an indication of passion, prejudice, partiality, sympathy, undue influence or a mistaken measure of damages on the part of the fact[-]finder." (internal quotation marks and citation omitted)); *Morga v. Fedex Ground Package Sys., Inc.*, 2018-NMCA-039, ¶ 12, 420 P.3d 586 (same), *cert. granted*, 2018-NMCERT-___ (No. S-1-SC-36918, June 4, 2018); *Salopek v. Friedman*, 2013-NMCA-087, ¶ 30, 308 P.3d 139 (same); *Wachocki v. Bernalillo Cty. Sheriff's Dep't*, 2010-NMCA-021, ¶ 48, 147 N.M. 720, 228 P.3d 504 (same), *separate holding aff'd*, 2011-NMSC-039, 150 N.M. 650, 265 P.3d 701; and *Sandoval*, 2009-NMCA-095, ¶¶ 13-17 (same); *with Nava*, 2004-NMSC-039, ¶¶ 16-20 (describing only the second test as part of "the analytical framework" governing remittitur in New Mexico, *id.* ¶16, and concluding that that test had been satisfied, partly because "the jury was presented with insufficient evidence to place a high dollar value on [the] plaintiff's emotional harm," *id.* ¶ 19 (internal quotation marks and citation omitted)); *and Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 17 (requiring courts to "apply[ the second] standard"). We do not think anything in this case turns on whether we frame the inquiry as proceeding under one test or two, and Defendant has not argued that the analysis under the two tests differs.

support in the record, the burden then shifts to the appellee to show that the [judge] was correct." *Nava*, 2004-NMSC-039, ¶ 16 (internal quotation marks and citation omitted). We will affirm only if the appellee shows that "the opinion of the trial judge is demonstrably more reliable than that of the jury[.]" *Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 17.

## A. Back Pay

**{72}** The jury awarded $239,451 to compensate Plaintiff for lost back pay for two years and ten months, which is the amount of time that Plaintiff was unemployed between her termination and the time of trial. The judge remitted this award to $84,513, the equivalent of back pay for the 2014-15 fiscal year, based on the conclusion that any additional award of back pay "would be speculative with the evidence that was presented." We infer from the ruling itself, and the explanation for it, that the judge reasoned that only through speculation could the jury have found that Defendant's retaliation probably caused Plaintiff to be unemployed for more than one year—i.e. that the evidence did not support a rational conclusion but for the retaliation, Defendant probably would have renewed Plaintiff's annual contract beyond the 2014-15 fiscal year.

**{73}** Defendant has not persuaded us that the judge's opinion with respect to the quantity of back pay damages "is demonstrably more reliable than that of the jury." *Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 17. We begin with the presumption that the jury followed the instruction, *Britton v. Boulden*, 1975-NMSC-029, ¶ 6, 87 N.M. 474, 535 P.2d 1325, that its "verdict should not be based on speculation, guess or conjecture." *See Mascarenas v. Jaramillo*, 1991-NMSC-014, ¶ 22, 111 N.M. 410, 806 P.2d 59 ("Damages based on surmise, conjecture or speculation cannot be sustained."). The jury did not need to speculate to find that it was more likely than not that Plaintiff would have remained employed as a director through the time of trial had Defendant not retaliated against her. Importantly, the jury instructions required Plaintiff to prove by a preponderance of the evidence that the retaliation "contribute[d]" to her not being employed by Defendant through the time of trial. As we have explained, the jury had a reasonable basis for rejecting Defendant's affirmative defense that it would have terminated Plaintiff's employment even if she had not engaged in protected activity. And, as described in our affirmance of the district court's reinstatement order, the jury also heard evidence that Plaintiff's career at the college was on a positive path until the reprisals began. Plaintiff had previously and repeatedly renewed her annual employment contracts, had received praise and recognition—including a recent promotion—from her superiors, and had been tasked with implementing a revitalization project projected to last several years. From this evidence the jury could have concluded, reasonably and without speculation, that Plaintiff would have remained in her position as campus director at the time of trial if Defendant had not retaliated against her.

**{74}** Defendant argues that the positions Plaintiff held before her removal as Director of the El Rito campus no longer existed after the 2014-15 fiscal year; that Plaintiff had been employed pursuant to one-year employment contracts that Defendant could have

declined to renew for legitimate reasons; and that there was no evidence that the El Rito revitalization plan continued after the 2014-15 fiscal year. Defendant contends that Plaintiff failed to present evidence "of a highly paid director conducting programs and events to revitalize the El Rito campus in recent years." But Plaintiff was not required to prove that her campus director position and the revitalization project continued to exist *despite* Defendant's retaliation against her. Instead, Plaintiff's burden under the jury instruction was to prove that if Defendant had *not* retaliated against her, it is more likely than not that she would have remained in a director position. The jury was instructed that "[a]n act is a 'cause' of damages if it contributes to bringing about the damages and if [the] damages would not have occurred without it." As we have explained, the jury could have concluded that it was more likely than not that *without* the retaliation, Plaintiff would have remained in the director position through the time of trial. We recognize that financial considerations or other factors apart from retaliation might have caused Defendant not to renew Plaintiff's contract after the 2014-15 fiscal year. Yet the jury was not compelled to reach that conclusion. It was free to conclude, as it must have in returning its verdict in accordance with the jury instructions, either that (1) retaliation was probably the only cause and that the other factors were probably not causes or (2) the causes were probably a combination of retaliation and the other factors. Speculation was not necessary to reach either conclusion.

**{75}**   We hold that the evidence substantially supports the jury's award of back pay damages and that the verdict does not shock the conscience.

## B.   Emotional Distress

**{76}**   With respect to emotional distress, the judge provided the following justification: "[G]iven the testimony in this case and the amount of damages, I do believe that the damages awarded are excessive, and that those damages would have been the result of sympathy or prejudice." As we understand this explanation and the judge's ruling on the remittitur motion, the judge concluded that $180,000 was $90,000 more than necessary to compensate Plaintiff for the emotional harm she suffered, and the judge inferred that unidentified sympathy or prejudice must have accounted for the $90,000 difference between his opinion and the jury's. We recognize that a sufficiently large variance between the evidence of harm and the amount of damages can support an inference that improper considerations influenced the jury's verdict. *See Nava*, 2004-NMSC-039, ¶ 20 (affirming remittitur because the jury's award was "so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice" (internal quotation marks and citation omitted)); *Vivian*, 1961-NMSC-093, ¶ 14 (inferring that a "grossly excessive" verdict resulted from "passion, prejudice, partiality, sympathy" or the application of an incorrect measure of damages). However, Defendant has not demonstrated that such a variance exists in this case.

**{77}**   The jury heard evidence that Plaintiff suffered from significant emotional distress beginning in October 2013, when Defendant reprimanded her and removed her from her position as campus director in retaliation for whistleblowing. Plaintiff testified that the retaliation amounted to being "punished severely for trying to do a good job" and

explained that Defendant's actions came as a shock to her. When she was removed and transferred, she was "shoved in a corner with nothing to do [her] job with" and "completely ostracized from the entire campus community." This had a negative impact on her self-confidence in the workplace. Her physician recommended that she see a counselor to "adjust to the punishment," and she did so several times between October 2013 and June 2014. However, she was unable to continue with mental health treatment as a result of her termination and resulting loss of health insurance. Her termination ended a relationship with the college that she had developed over the course of more than four years, during which she devoted a great deal of time to her work, earned positive reviews until the reprisal began, took the initiative to create and implement a plan to revitalize one of Defendant's campuses, and was promoted to campus director. Plaintiff's depression continued while she was unemployed, as she endured the stress of losing her job, her income, her insurance, and her residence on campus. She struggled to get up in the morning and found it impossible to socialize. At the time of trial, nearly three years after her termination, Plaintiff, though still unemployed, was doing better emotionally. [12]

**{78}** Determining how much money would justly compensate Plaintiff for the emotional harm she described entails the exercise of subjective judgment. *Cf. Mathis*, 1956-NMSC-074, ¶ 8 ("In every case of personal injury a wide latitude is allowed for the exercise of the judgment of the jury[.]"); *Powers v. Campbell*, 1968-NMSC-111, ¶ 9, 79 N.M. 302, 442 P.2d 792 (recognizing that the amount of pain and suffering awards "rests with the [fact-finder's] good sense and deliberate judgment" about "what is just compensation" based on the facts and circumstances of the individual case). Neither judges nor juries have a mathematical formula or precise measuring tool that will generate a single correct answer to the difficult problem of assigning monetary value to a person's suffering. *See Sweitzer v. Sanchez*, 1969-NMCA-055, ¶ 19, 80 N.M. 408, 456 P.2d 882 ("[T]here is no standard by which damage from emotional distress may be measured."); *Powers*, 1968-NMSC-111, ¶ 9 (recognizing that there is no "fixed measure of compensation" for pain and suffering); *Montgomery ex rel. Montgomery v. Vigil*, 1958-NMSC-133, ¶ 11, 65 N.M. 107, 332 P.2d 1023 ("We recognize the difficulty of determining what is proper recompense for the pain and suffering of the plaintiff in this or any other case."); *Mathis*, 1956-NMSC-074, ¶ 8 ("There is no standard fixed by law for measuring the value of human pain and suffering."); *Sandoval*, 1998-NMCA-085, ¶ 13 ("[T]he valuation of pain and suffering is a difficult, inexact undertaking at best."); *Grammer v. Kohlhaas Tank & Equip. Co.*, 1979-NMCA-149, ¶ 58, 93 N.M. 685, 604 P.2d 823 ("No one can measure another's pain and suffering[.]"). Reasonable people who conscientiously consider the same evidence can arrive at different answers.

**{79}** In our view, that is what happened in this case. We presume that the jury followed the instruction to fix an amount that "reasonably and fairly compensate[d] [P]laintiff" when it awarded $180,000. The judge disagreed, concluding that Plaintiff's emotional harm did not warrant $180,000, though it was substantial enough to warrant $90,000. We think that both the jury and the judge selected amounts within a

---

[12]Defense counsel did not cross-examine Plaintiff about the nature, intensity, or duration of her emotional harm.

reasonable range in light of the facts. Plaintiff presented evidence that she suffered from significant emotional harm over a prolonged period of time, while she was employed and after she was terminated, as a result of unlawful reprisal that derailed Plaintiff's career, which had been on a positive trajectory for years until Defendant began retaliating against her. The jury could have reasonably concluded that $180,000 was just compensation and that a lower amount was insufficient based on the likely emotional impact of the type of retaliation Defendant directed at Plaintiff, the severity of the emotional harm that the jury believed was likely to flow from the damage to her career and finances, her testimony about the specific ways in which her depression manifested itself, and the jury's assessment of her demeanor while testifying. The jury's opinion about damages is presumptively correct, and Defendant has not persuaded us that the judge's opinion "is demonstrably more reliable than that of the jury." *Allsup's Convenience Stores, Inc.*, 1999-NMSC-006, ¶ 17. The difference of opinion between the jury and the judge therefore does not justify the remittitur. To hold otherwise would shrink the deference to juries that New Mexico precedent mandates and expand judges' limited superintendence.

**{80}**　We do not agree with Defendant's contention that the remittitur here is consistent with the remittitur our Supreme Court affirmed in *Nava*. In that case, the jury found that the plaintiff's emotional distress damages for being subjected to sexual harassment in the workplace were $285,000, an amount equal to the plaintiff's salary for five years. *Nava*, 2004-NMSC-039, ¶¶ 2, 16, 18-19. The judge remitted the verdict to $90,250, concluding that it was based on "either sympathy or an improper motive to punish [the d]efendant." *Id.* ¶ 17. In support of this conclusion, the judge found that: (1) "[the p]laintiff was not fired, demoted, suspended, or disciplined"; (2) "[the p]laintiff presented no evidence of concrete special damages"; (3) "[the p]laintiff received no professional mental health care"; (4) "the discrimination was limited to a nineteen-month period"; and (5) "[the p]laintiff received two-and-a-half times the amount requested in her closing argument." *Id.* But no similar facts are present in the case before us. In contrast to *Nava*, here (1) Plaintiff was both disciplined and terminated; (2) Plaintiff presented evidence of concrete damages in the form of lost income and benefits; (3) Plaintiff received professional mental health care for several months, stopping only because she lost her health insurance; (4) no evidence narrowed the duration of Plaintiff's emotional distress to a time frame that would call the jury's verdict into question; and (5) the verdict did not exceed any requested amount as Plaintiff did not request a specific amount. Because of these significant differences between *Nava* and this case, *Nava* does not support affirmance here.[13]

---

[13]Plaintiff and Defendant invite us to compare the facts and verdict in this case with the facts and verdicts in other cases. Whether such comparisons may be of any use is not entirely clear. *Compare Montgomery*, 1958-NMSC-133, ¶ 11 (deeming "it helpful to consider other verdicts in similar cases insofar as it is possible to make such comparison" but explaining that "each case must be ruled chiefly upon its own facts and circumstances" (internal quotation marks and citation omitted)), *and Nava*, 2004-NMSC-039, ¶ 19 (making such comparisons), *with Sandoval*, 2009-NMCA-095, ¶ 18 ("We are skeptical about the usefulness of comparing awards for pain and suffering in other cases."); *Robinson v. Mem'l Gen. Hosp.*, 1982-NMCA-167, ¶ 20, 99 N.M. 60, 653 P.2d 891 (stating that a comparison of the verdict at issue to those in other cases was improper because "the question of excessive damages must be determined

**{81}** Defendant has not carried its burden of demonstrating that this is an extreme case in which it is necessary to correct an emotional distress verdict so excessive as to shock the conscience.

## VI.     Interest on Back Pay

**{82}** The final issue on appeal is whether the district court erroneously denied Plaintiff's request for post-judgment interest on her damages for back pay. Under NMSA 1978, Section 56-8-4(D) (2004), the state enjoys sovereign immunity from awards of interest on judgments "except as otherwise provided by statute or common law." The issue here is one of first impression: whether the WPA provides for a statutory exception in Section 10-16C-4(A), which states that a public employer found to have violated the WPA "shall be liable" for, among other things, "two times the amount of back pay with interest on the back pay." Because our analysis hinges on statutory interpretation, our standard of review is de novo. *See Cates*, 2017-NMCA-063, ¶ 14.

**{83}** Three precedents of our Supreme Court interpreting Section 56-8-4(D) shape our analysis. In *Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶¶ 44-47, 125 N.M. 721, 965 P.2d 305, the question was whether NMSA 1978, Section 41-4-19(B) (1991), which explicitly barred awards of pre-judgment interest against state entities and employees, implicitly provided for awards of post-judgment interest. The Court explained:

> Section 56-8-4(D) contemplates that the state and its political subdivisions will not be immune from post-judgment interest where a statute or the common law explicitly provides. Section 41-4-19(B) does not so provide. The Section does not expressly state that the immunity provided to the state and its political subdivisions for post-judgment interest is waived under the TCA.

*Trujillo*, 1998-NMSC-031, ¶ 47. The Court applied Section 56-8-4(D) again in *Gonzales v. New Mexico Department of Health*, 2000-NMSC-029, ¶¶ 37-38, 129 N.M. 586, 11 P.3d 550, this time to NMSA 1978, Section 28-1-13(D) (1987, amended 2005), a provision of the NMHRA, which "states that, with respect to actual damages and attorney[] fees, 'the state shall be liable the same as a private person.' " *Gonzales*, 2000-NMSC-029, ¶ 37. The Court held that Section 28-1-13(D) does not create a statutory exception for purposes of Section 56-8-4(D). The Court reasoned, in pertinent part, that "Section 28-1-13(D) makes no mention of the assessment of interest," and

---

from the evidence in this case"); *Sweitzer*, 1969-NMCA-055, ¶ 5 (stating that "[w]hat this [C]ourt may have done in other cases, . . . [was] of no consequence" because the measure of damages must be determined from the evidence in each case (internal quotation marks and citation omitted)). Assuming without deciding that courts may compare similar cases despite the wide latitude the law gives juries in assessing emotional distress damages and the inexactness of such assessments, we decline to do so here because the parties have not cited cases that are factually similar enough to allow any meaningful comparison. Another obstacle to helpful comparison is that the verdicts in several of the cited cases are two or three decades older than the verdict in this case. Because of the impact of inflation over long spans of time, we doubt that the verdicts in such dated cases could serve as useful yardsticks for measuring the verdict in this one, even if the cases were factually similar.

that the plaintiff "offered no authority suggesting that the phrase 'actual damages and reasonable attorney[] fees' should be expanded to include interest." *Gonzales*, 2000-NMSC-029, ¶ 38. The Court reaffirmed *Gonzales* in *Nava*, 2004-NMSC-039, ¶ 22, holding that the plaintiff was "not entitled to post-judgment interest for her claim under the NMHRA because Section 28-1-13(D) does not explicitly waive the [s]tate's immunity from post-judgment interest." *Nava*, 2004-NMSC-039, ¶ 23.

**{84}** Critically, unlike the statutes in *Trujillo*, *Gonzales*, and *Nava*, Section 10-16C-4(A) explicitly imposes liability for "interest" on the state and its subdivisions. *See* § 10-16C-2(C) (defining "public employer" to include, among other things, "any department, agency, office, institution, board, commission, committee, branch or district of state government"; "any political subdivision of the state . . . that receives or expends public money from whatever source derived"; and "any entity or instrumentality of the state specifically provided for by law"). This leaves us with no doubt that the Legislature intended to waive sovereign immunity for "interest" on back pay. To conclude otherwise would render the word "interest" meaningless, contrary to a "favored canon of statutory construction—the maxim that the [L]egislature is presumed not to have used any surplus words in a statute[ and that therefore] each word is to be given meaning." *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 32, 117 N.M. 346, 871 P.2d 1352. So, in contrast to the issues before our Supreme Court in *Trujillo*, *Gonzales*, and *Nava*, the question in this case is not whether the statute *implicitly* waives immunity for interest but instead whether the *explicit* waiver for "interest" encompasses post-judgment interest.

**{85}** We find the answer in the plain language of Section 56-8-4 and Section 10-16C-4(A). *See Whitely*, 1993-NMSC-019, ¶ 5 (recognizing that "the plain language [is] the primary indicator of legislative intent"). We begin with Section 56-8-4, which addresses each type of interest in a separate provision: post-judgment interest in Subsection A and pre-judgment interest in Subsection B. This is significant because the sovereign immunity provision in Subsection D creates an "exempt[ion] from *the provisions of this section* except as otherwise provided by statute or common law." *Id.* (emphasis added). By its plain language, Subsection D applies to *all* of the provisions of Section 56-8-4, exempting the state and its subdivisions from both post-judgment interest (Subsection A) and pre-judgment interest (Subsection B) but allowing the Legislature to craft exceptions. We must therefore presume that when the Legislature enacted the WPA, including Section 10-16C-4(A), it was aware that Section 56-8-4(D) would immunize the state from both pre- and post-judgment interest on back pay awards unless the Legislature explicitly provided for a waiver of some kind. *See In re Kira M.*, 1994-NMSC-109, ¶ 15, 118 N.M. 563, 883 P.2d 149 ("We presume the [L]egislature is aware of existing law when it enacts legislation."); *Janet*, 2013-NMCA-037, ¶ 20 (interpreting the WPA in light of the "principle that the Legislature is fully aware of both statutory and common law when crafting statutes"). The choices before the Legislature were therefore whether to waive immunity, which it clearly did, as we have explained, and whether that waiver should include both types of interest or just one of the two. By selecting the generic word "interest" in Section 10-16C-4(A), rather than more specific language, the Legislature waived immunity for both pre- and post-judgment interest on awards of back pay. Had the Legislature intended to waive immunity for just one type of interest and

preserve immunity for the other, it could have easily done so by, for example, simply inserting "pre-judgment" or "post-judgment" before "interest." *See Chatterjee v. King*, 2011-NMCA-012, ¶ 15, 149 N.M. 625, 253 P.3d 915 (recognizing that "the Legislature knows how to include language in a statute if it so desires"), *rev'd on other grounds by* 2012-NMSC-019, 280 P.3d 283. Instead of narrowing the scope of the waiver in this manner, the Legislature chose not to limit the type of "interest" in any way. To conclude that "interest" includes only pre-judgment interest and excludes post-judgment interest, we would have to rewrite the statute by adding the word "pre-judgment." We will not do so because the statute makes sense as written. *See State ex rel. Barela v. N.M. State Bd. of Educ.*, 1969-NMSC-038, ¶ 7, 80 N.M. 220, 453 P.2d 583 ("We are not permitted to read into a statute language which is not there, particularly if it makes sense as written."); *Martinez v. Sedillo*, 2005-NMCA-029, ¶ 7, 137 N.M. 103, 107 P.3d 543 ("We will not rewrite a statute.").

{86}    Defendant argues that Section 10-16C-4(A) does not meet our Supreme Court's explicitness requirement for waivers of immunity because the statute does not include the phrase "post-judgment interest." If Defendant is correct, then the Legislature must use a phrase such as "pre-judgment and post-judgment interest on the back pay," rather than just using the word "interest," if it wishes to waive immunity for both types of interest. Neither Section 56-8-4(D) nor the precedent interpreting it mandates this hyper-technical approach. The teaching of *Trujillo*, *Gonzales*, and *Nava* is that courts may not *infer* a waiver; a waiver exists only when a statute explicitly makes the state liable for interest. Section 10-16C-4(A) does so. And it would serve no useful purpose to require the Legislature to add unnecessary adjectives such as "pre-judgment" and "post-judgment" to modify the noun "interest" because its broad meaning is clear without such elaboration. Requiring superfluous language would undermine the Legislature's objective by draining all meaning from the statutory mandate that public employers be held liable for "interest on the back pay" and instead treating public employers as immune from such liability. We decline to do so.

{87}    We hold that by explicitly making public employers liable for "interest on the back pay" in Section 10-16C-4(A), our Legislature waived sovereign immunity for post-judgment interest pursuant to Section 56-8-4(D).

## CONCLUSION

{88}    We reverse the orders regarding remittitur and post-judgment interest, affirm as to all other issues, and remand for further proceedings consistent with this opinion, including any proceedings necessary to resolve Plaintiff's request that Defendant pay her litigation costs and reasonable attorney fees for this appeal pursuant to Section 10-16C-4(A).

{89}    **IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**MEGAN P. DUFFY, Judge**